## City of Henderson v. Ashby.

(Decided February 26, 1918.)

### Appeal from Henderson Circuit Court.

1. Municipal Corporations—Electricity—Electricity Companies Owned by a Municipal Corporation—Duty to Trespasser on Private Premises.—A municipal corporation owning and operating an electric light plant, is under no duty to a trespasser on private premises outside the city to maintain its wires in safe condition.

2. Landlord and Tenant—Judicial Sales—Authority of Purchaser to Rent Premises Before Confirmation of Sale.—Since the purchaser at a judicial sale has neither the legal title nor the right of possession prior to the confirmation of the sale, he is without authority to rent the premises between the date of the sale and the date of its confirmation or even to receive the rent therefor during that period.

3. Landlord and Tenant—Lease—Evidence—Sufficiency.—In an action against a municipal corporation to recover for personal injuries caused by plaintiff coming in contact with the city's electric wires on private premises outside the city, where plaintiff based his right of recovery on the ground that he was on the premises by the invitation or permission of the owner's tenants, evidence examined and held insufficient to show that the alleged tenants had rented that portion of the premises on which the accident occurred.

B. S. MORRIS and VANCE & HEILBRONNER for appellant.

HENSON & TAYLOR for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Plaintiff, A. H. Ashby, brought this suit against the city of Henderson to recover damages for personal injuries. From a verdict and judgment in his favor for $3,000.00, the city appeals.

The city owns and operates an electric light plant. T. J. Moss owned a place consisting of about four and one-half acres and lying north of the city and just beyond the city limits. Prior to its destruction by fire, the residence on these premises was lighted by the city. The electricity was carried through high voltage wires to a pole near the garden fence. The wires were then passed into a transformer and from there to the residence were two wires carrying a voltage of 110. After the fire which occurred in the month of July, 1915, the wires became detached from the residence and lay on the ground in the garden.

At about ten o'clock on the morning of January 29, 1916, plaintiff started to the home of his brother who lived just back of the Moss place. He had with him a couple of hounds. The hounds jumped a rabbit and ran it into the Moss place. At that time Fred and Ogle Herron, who kept their teams in the stable lot, were hitching up and it began to rain. Fred said to plaintiff, "Go in that little house (a shanty on the place) and I will come in when I unhitch." Plaintiff and his brother-in-law, John Parr, who accompanied him, were soon joined by Fred and Ogle Herron. After being there for about half an hour, they heard a dog "holler" and run toward its home. At the suggestion of Fred Herron they went to the smoke-house thinking that some kind of an animal had attached one of the dogs. While there, John Parr was sent to plaintiff's home to get another dog belonging to plaintiff. After Parr returned with this dog, plaintiff, Parr and Fred Herron took the dog and went into the garden which was located about forty feet from the house where they had been. The garden was covered with high grass and weeds. Parr was leading the dog with a leather strap. Plaintiff was just behind the dog. The dog was seen to grab at something and fall back. Thinking that something had gotten hold of the dog, plaintiff caught hold of its hind legs with the intention of pulling it away. He did not know that the wire was there or that the dog had hold of it. Plaintiff received a severe shock, and was released from the dog by Fred Herron. The dog was instantly killed. Plaintiff was carried to his home where he remained in bed for a few days. According to the evidence for the defendants, Mr. Ashby frequently handled the wires with his naked hands without receiving any injury or shock of any kind. After the accident, the wires were removed by the employees of the light company and handled by them without gloves. There was also evidence that it was impossible for the secondary wires leading to the residence to come in contact with the high voltage wires and that the secondary wires carried a voltage of only 110.

It can not be doubted that there was sufficient evidence of the city's negligence provided the city owed the plaintiff the duty of maintaining its wires in a reasonably safe condition. The accident, however, did not happen at a place where the public, as such, had a right to go. It happened on private premises and the liability

of the city depends on whether plaintiff was a mere tres-
passer or had the legal right to be on the premises.
Rodgers' Admr. v. Union Light, Heat & Power Co., 123
S. W. 293. And whether plaintiff was rightfully on the
premises turns on whether he was there by the invita-
tion or permission of the owner's tenants. This ques-
tion depends on whether the Herrons had rented and
were in possession of the entire premises or had rented
merely the stable and stable lot. If the former, they had
the right to invite or permit plaintiff to go on any por-
tion of the premises. If the latter, their tenancy and
possession were confined to the stable and stable lot, and
they were without authority to invite or permit plaintiff
to go into the garden, which was not covered by the lease.
For the purpose of reaching a correct conclusion of the
matter we give below all the evidence bearing on the sub-
ject.

The testimony of Ogle Herron, son of George W. Her-
ron, is as follows:

"Q. State whether or not you gentlemen were occu-
pying that lot or had charge of it? A. Yes, sir. Q. Kept
your stock there? A. Yes, sir. Q. When did you gentle-
men first commence there with that stock? A. About the
last of November. Q. You were not actually living on
the place, but kept your stock there? A. Yes, sir. Q.
You said a moment ago something about occupying those
premises up there. You don't know anything about any
contract by which your father had possession of the
place, or your brother, or you? A. Except what they
told me. Q. You never heard any contract between your
father and brother with Mr. Moss or Mr. Herron? A.
Never heard anything only what they said. Q. The little
house you went into after you came over there after the
dogs and rabbit, was that in the lot occupied by you peo-
ple? A. Yes, sir; a fence separated it from the stable
lot. Q. I believe you all just had the stable lot rented?
A. I know we were occupying the stable and lot at that
time. Q. That is all you occupied? A. Yes, sir. Q. You
were not occupying anything else, were you? Objection by
plaintiff; overruled; exception. A. No, sir, they were
not. Q. You were occupying no other property except
the stable house and lot? A. That is all we were occupy-
ing. Q. You say your brother caught hold of Mr. Ashby
after he took hold of the dog and Mr. Ashby hollered, 'O
Lordy, my poor dog,' and you say your brother caught
hold of him? A. I believe he did. It has been so long I

don't remember. Q. Did your brother get a shock? A. I don't know; never heard anything about it. Q. You never heard anything about it? A. No.''

Re-examined by Judge J. W. Henson, for plaintiff.

''Q. You say you were only occupying the stable lot. Do you mean to say this is the only part of the premises they rented? A. I don't know. That is all we had use for. Q. You mean all you actually had in use was the stable? A. Yes, sir. Q. You say you don't know anything about the contract? A. No, sir; I never heard the contract.''

Fred Herron testified as follows:

''Q. State to the jury whether or not your father and you, or either of you, was occupying under a rental contract, this Moss and Herron property at the 29th day of January, this year? A. I rented it from Mrs. Moss, I believe, along in November. Q. I don't care about that. I am asking if you had possession of it? A. Yes, sir. Q. On the 29th day of January, 1916? A. Yes, sir. Q. Were you living over there? A. No; we never did live there; had stock over there. Q. Mr. Herron, you started to say something a moment ago in response to question about you having that stable and lot rented; I wish you would tell what you had reference to at that time. Objection by plaintiff; overruled; exception. A. At what time do you mean? Q. When Mr. Ashby was hurt. A. I don't know anything about that. My father had that trade made. He told me——. Objection by plaintiff; sustained. Q. I asked you what you know personally? A. That is all I know. You know now. Q. You don't know whether you or your father or brother had those premises rented of your own knowledge? A. I told you my father had it rented. Q. I believe that you said he had rented that for the month of December? Objection by plaintiff; overruled; exception. A. Up to the first of January. Q. You made the trade with Mrs. Moss? A. Yes, sir. Q. And that was just for the stable lot? Objection by plaintiff; overruled; exception. A. I told her that I wanted that place for mules. Q. That was how you were occupying it? A. That is all I had use for. Q. And that is what you were paying for? For that stable lot? A. Yes, sir. You didn't have this lot behind rented where the house is? A. It is just like I told you. I wanted to rent the place to keep some mules. I didn't tell her I wanted it all. I wanted a stable. Q. And that is all you talked about—the stable and stable lot? A. I wanted

a place for the horses. Q. Did you have that whole place rented for December, 1915, or just the stable lot? Or, that whole tract of ground—about four or five acres? Objection by plaintiff; overruled; exception. A. We was just using the stable and lot. Q. I am asking you what you had rented? A. I don't know. I don't know whether we had it all or just the stable. Q. Do you know whether you had this garden rented or not? Objection by plaintiff; overruled; exception. A. That is all there was to it. I told her I wanted to have a place to keep the mules. Q. Up to the time Cotton Ashby got hurt, did you have it occupied by anything? A. We never did have it occupied, never did have anything but the horses there. Q. You were not occupying any part of the Moss premises up to the time Cotton Ashby got hurt, except the stable and stable lot? Objection by plaintiff; overruled; exception. A. No.

By the court:

"Q. Where was this wire? In the garden or up where the house was burned? A. It was right at the back of the house in the garden. Q. Who cultivated the garden that year? A. I don't know who did; whether it was cultivated or not."

For the defendant, Mrs. T. J. Moss, wife of T. J. Moss, the owner of the premises in question, testified that the premises were divided into six tracts and that Fred Herron rented only the stable and stable lot for the month of December with the understanding that he was to vacate when the sale took place. When the trade was made, Fred said that that was all he wanted. T. J. Moss testified that he never rented any part of the land to George W. Herron, Fred Herron, or Ogle Herron. It further appears that the commissioner's sale took place on January 3, 1916, when H. H. Herron became the purchaser and that the sale was not confirmed until February 26, 1916.

In addition to the foregoing evidence, George W. Herron testified that some time between the middle and the last of January, 1916, he rented the entire premises from his brother, H. H. Herron, the purchaser at the judicial sale, for a period of one year. On the other hand H. H. Herron testified that his brother George came to him about the first of March to rent the place and that he never leased the premises to his brother but told him that he had turned the property over to

the Ohio Valley Banking & Trust Company and that he would have to see that company. Both the cashier and trust officer of that company say that George W. Herron came to them for the purpose of leasing the property but they declined to lease the property and told him to vacate the premises which he subsequently did.

By instruction No. 3, the court told the jury that T. J. Moss was the legal owner of the premises until the 26th day of February, 1916, the day the commissioner's sale was confirmed, and if they believed from the evidence that at the time of the injury, T. J. Moss by himself or through his wife as agent, had rented to George W. Herron and Fred Herron only the stable and stable lot and the lease did not include that portion of the premises where the injury occurred, then Fred Herron, Ogle Herron and plaintiff were trespassers on that part of the premises where the accident happened and they should find for the defendant as the defendant owed plaintiff no duty.

There can be no doubt that the trial court ruled correctly in holding that T. J. Moss was the owner of the premises up to the time of the confirmation of the judicial sale, and in confining the jury to a consideration of the evidence bearing on the rental contract made with the Herrons through his wife. The right to rent property is an incident of the title and possession, and since H. H. Herron, the purchaser at the judicial sale, had neither the legal title nor the right of possession prior to the confirmation of the sale, it follows that he was without authority to rent the premises between the date of the sale and the date of its confirmation, or even to receive the rent therefor during that period. Taliaferro v. Gay, 78 Ky. 499; Ball v. Covington First National Bank, 80 Ky. 501; Smith v. Newman, et al., 140 Ky. 80, 130 S. W. 953, Ann. Cas. 1912B, 395.

Since H. H. Herron had no right to rent the premises to George W. Herron after the judicial sale and prior to its confirmation, it follows that the question whether plaintiff was a trespasser depends on whether the Herrons rented from T. J. Moss the entire premises including the garden where the accident occurred or merely the stable and the stable lot. Reviewing the evidence on this question, we find that neither George W. Herron nor Ogle Herron was present when the contract

was made, though both testified that they used only the stable and stable lot for their teams. Fred Herron who made the contract with Mrs. Moss, testified that he told her that he wanted the place for the mules. He also testified that that was all he had use for, and that that was what he was paying for. He further stated that he did not tell her that he wanted it all, but that he wanted the stable. On being asked what he had rented, he replied, "I don't know. I don't know whether we had it all or just the stable." On the other hand, Mrs. Moss, with whom he made the contract, testified emphatically that she only rented Fred the stable and stable lot and when the trade was made he said that that was all he wanted. Clearly the burden was on plaintiff to show that the rental contract included the garden where the accident occurred. Since Mrs. Moss testified emphatically that only the stable and stable lot were rented and since Fred Herron was not only unable to say that he had rented all the premises but testified to facts tending to corroborate Mrs. Moss's recollection of the contract, it follows that there was no evidence tending to show that the entire premises were rented. That being true, it was error to submit this issue to the jury and the trial court should have held as a matter of law that plaintiff was a trespasser and have directed a verdict in favor of the defendant.

This conclusion makes it unnecessary to determine whether the damages were excessive.

Judgment reversed and cause remanded for a new trial consistent with this opinion.