W. Scott Hanna, Administrator, Appellee, v. Central States Electric Company, Appellant, et al., Defendant.

No. 39951.

SEPTEMBER 22, 1930.

*Barnes, Chamberlain, Hanzlik & Thompson* and *Harrington & Dickinson,* for appellant.

*Sullivan, McMahon & Linnan* and *D. M. Kelleher,* for appellee.

DE GRAFF, J.—On May 20, 1928, plaintiff's decedent, Maria

Floris, met her death by electrocution in coming in contact with a wire fence on the Minneapolis & St. Louis Railway right of way, which fence was electrified by a broken high-voltage transmission wire. The current was generated at the plant of the defendant Iowa Public Service Company at Humboldt, Iowa. At the time of the accident, the defendant Central States Company owned, as part of the used transmission line, the line from Luverne to Corwith, but was not using same in the transmission of its own current. However, that utility company had full knowledge of the use of its transmission line in the sending of juice over it by the Iowa Public Service Company.

The petition of plaintiff against the joint defendants predicates recovery on their joint and concurrent negligence. It is alleged by the plaintiff-administrator in his petition that the two utility companies (Central States Electric Company and the Iowa Public Service Company) "were jointly and concurrently negligent in transmitting a high and dangerous current of electricity," and "were jointly and concurrently negligent in failing by means of throwing switches or otherwise to cut off said high and dangerous current of electricity from said transmission lines after the break in the said transmission lines had occurred and was actually known, or in the exercise of reasonable care would be known to the said defendants," and "were negligent in failing to locate and repair the defects and break in the said transmission lines."

In order to visualize the geography of the towns or stations to which the record evidence refers, the following diagram will be helpful:

Some historical matters may first be recited. On June 3, 1927, a written contract was entered into by and between the town of Corwith and the defendant Central States Company, whereby the town, which then owned and operated the high tension transmission line extending from the corporate limits of the town to the corporate limits of the town of Luverne, sold the same to the Central States Electric Company. This contract of sale included not only the high transmission line between said towns, but also the substation at Corwith owned by the town; but the sale did not include the distributing system owned by Corwith and located in said town. Corwith, through the town council, took the necessary legal steps to approve by resolution the said contract, and submitted the contract proposition in due and legal form to the electors of the town on July 6, 1927. The majority of the electorate voted in favor of the submitted proposition.

In 1924, the Northern Iowa Gas & Electric Company of Humboldt, grantor of the Iowa Public Service Company, entered into a written contract with the incorporated town of Corwith, whereby the said company obligated itself to furnish current for five years, or from the date of said contract to April 7, 1929. This contract was never submitted to the electorate for adoption, but the service as contemplated was continued without any interference on the part of anyone until the Corwith-Central States contract of 1927 became effective, and thereafter until the Central States Electric Company constructed a new transmission line from the town of Wesley to Corwith, and cut in at Corwith for electrical service in the latter part of July, 1928. It therefore appears without dispute that, at the time of the accident in question on May 20, 1928, the Iowa Public Service Company was sending a high voltage from its plant at Humboldt to the town of Corwith, and that said voltage passed over the Luverne-Corwith wires owned by the Central States Company. It also appears without dispute that both of these utility companies knew, for three days prior to the accident, that there was a break on the Luverne-Corwith line. This discovery was made by the operator for the Iowa Public Service Company at Humboldt on May 17, 1928, at 10 P.M. The ammeter then showed two high phases and one low phase. This meant that there was a short or partial ground somewhere on the line be-

tween Luverne and Corwith on one of the three wires owned by the Central States. These observations were continued, with the same results, until May 20, 1928. In other words, the Iowa Public Service Company continued to "log" the instruments, and the charts showing the results were offered in evidence upon this trial. The testimony discloses that, had there been a complete ground or dead short, as it is termed, the switch connecting the lines would have been "kicked," and the Luverne-Corwith line would have been dead. There was, therefore, not a complete want of current over the said line, but a leakage, caused by the partly grounded wire on the Luverne-Corwith line. After the Iowa Public Service operators at Humboldt had made observations, in order to verify them and arrive at more definite conclusions they called Zentner, the Iowa Public Service Company operator at Luverne, and informed him of the situation. The line was tested again at Humboldt by the operator Beebe on Friday, May 18th, and Zentner was asked to open the switch and to leave it open five minutes, while the Humboldt operator watched the ammeter. This experiment disclosed that, when the switch was disconnected, the trouble as indicated by the ammeter ceased, and when it was again connected, the high and low phases reappeared. The manager of the Central States at Britt, Iowa, was informed by telephone by Beebe that there was trouble on his (Central States) end of the line, between Luverne and Corwith. The Central States manager then asked if the Iowa Public Service Company could pull the load until Saturday morning, and said that he would see that it was "fixed up, and that it was storming too bad that night to put his men out." The record shows that Zentner, at Luverne, looked after the Iowa Public Service line from Luverne to the first station south, as far as Livermore. The Hanna station, near which the accident happened, is between Luverne and Corwith. Both operators at Humboldt (Speilman and Beebe) had observed the trouble during the time in question, and both had communicated with Zentner, at Luverne. Both men had talked with the Central States manager, Eaton. In a telephone conversation from Eaton at Britt to Speilman, a similar conversation was had as with Beebe, heretofore related. It is also shown that Zentner had a talk by telephone with Eaton, in which Eaton was told that there was trouble on the Corwith-Luverne line, and Eaton said

that the Central States had made some minor change in the substation at Corwith, and probably the change was causing the trouble at Corwith, and that he (Eaton) would take care of it.

It is also shown that Eaton, who is conceded to be manager of the Central States Company at Britt, directed that the meter readings for Corwith (by whomsoever made) should be sent to Humboldt, and informed the town official that arrangements would be made by the Central States direct with the Iowa Public Service Company at Humboldt for that company to furnish the juice. It appears that the town clerk was solicitous about this matter, and made repeated inquiries as to when the Central States would cut in at Corwith and itself furnish the electrical energy to Corwith. It is also shown that considerable correspondence was had between the vice president of the Central States Company and officials of the Iowa Public Service Company relative to proposed changes that would save the Central States from capital investment, and at the same time permit the Iowa Public Service Company to continue to furnish the juice. In one of these letters, dated September 18, 1927, the vice president admitted that his company (Central States) was then serving Corwith at wholesale, and over the line the Central States bought and owned between Corwith and Luverne, formerly owned by Corwith.

The foregoing statement shows the material facts in this case. Neither utility company offered or introduced any evidence. Both defendants answered separately by general denial.

We now turn to the errors relied upon by appellant for reversal.

### A.

I. The initial complaint is that the court erred in admitting in evidence, over objection, the written contract between the Central States and the town of Corwith. The objections made by appellant are that:

"The contract is not connected up in any way with the issue of joint liability, and does not tend to establish anything but a several liability on the part of the Central States Company, if it tends to establish any liability at all."

Clearly, the contract was material to prove that the appellant did purchase the Luverne-Corwith transmission line in July,

870

1927, and that the appellant did have the ownership of the line. The trial court instructed that:

"The mere fact of ownership of the line would not carry with it the duty to repair the line, if in fact the Central States Company had not assumed that duty after July, 1927, and before the date of the accident."

This became the law of the case in this particular, but, in the light of the record evidence and other instructions given, it was not controlling on the question of tort liability. In the  instructions requested by appellant, it recognized the fact of ownership by purchase of the transmission line from Luverne through the station of Hanna to Corwith, but it is also true that the appellant in said instruction requested that the jury be told that the Central States was not operating the line or transmitting current over it. The trial court did, however, in Instruction 12, limit the liability of the Central States to a finding of active participation in the transmission of the current over the line at the time the accident occurred. The evidence discloses that the town of Corwith, after the sale of its line, had no duty and exercised no jurisdiction whatsoever over said line. The contract of purchase did contemplate not only the sale of the property, but the service to the town of electrical energy for distribution through its own distributing plant. Clearly, the appellant had an interest in seeing that there was no interruption in furnishing the current for the town; and until the Central States reconstructed its Kanawha line, or constructed a line from Wesley to Corwith, it was unable to supply Corwith with its own generated current. The contract in question was necessarily a proper matter for the jury to consider in determining the relation of the appellant, after the effective date of the contract, to the high-transmission line, over which line the current had to be sent, if appellant's obligation to supply current was to be performed. The requested instructions of the appellant refused by the court convey the thought that the Central States was not operating the line, nor transmitting current over it, nor responsible for the transmission of any current over it. Its position, in the last analysis, would result in the conclusion that the Iowa Public Service Company,

in transmitting the current, was a trespasser on the line owned by the appellant. The jury was justified in finding from the evidence, not only that the appellant had full knowledge of the source of the energy transmitted over the line from Humboldt to Corwith, but also, impliedly at least, that the current was transmitted at the request of the appellant.

Appellant relies on *Randall v. M. M. Moen Co.*, 206 Iowa 1319, on the inadmissibility of the Corwith contract. We do not view this authority as controlling the instant proposition. The decision of this court in that case is merely to the effect that the lower court erred in an instruction which made the terms of the contract between the owner of the premises and an independent contractor the measure of the contractor's duty to a third person in an action in tort brought by such third person against the contractor. It does not hold that a contract is inadmissible for a proper purpose, or that it is not material evidence to show the scope of the authority of the contractor upon the premises. It is said:

"It is true that, even in a tort case, the contract of the defendant may be material for a limited purpose. * * * Even in such a case, the contract may not be offered in evidence, for the purpose of proving a breach of its terms. Whether the written contract be material or not, it is not to be deemed the measure or definition of the common-law duty resting upon the defendant, the breach of which is charged against him as a tort. The nature and extent of that duty are defined by the law. * * * In other words, the defendant's liability in tort is not contractual, though contractual relations may be an incident of the tort."

In the case at bar, the instructions given did not make the terms of the contract definitive, or the measure of the common-law duty resting upon the appellant charged with tort. It is a well defined rule that, when a transmission company purchases the plant of another person or corporation and conducts its business, the purchasing company impliedly contracts with its customers and the public that it will, with such appliances and care as are known to the business, protect them from harm. See *Waller v. Leavenworth L. & H. Co.*, 9 Kan. App. 301 (61 Pac. 327); *Gordon v. Ashley*, 77 App. Div. 525 (79 N. Y. Supp. 274); *Rowe v. Commercial Cable Co.*, 216 Mass. 258 (103 N. E. 479);

*City of Henderson v. Ashby,* 179 Ky. 507 (200 S. W. 931, 14 A. L. R. 1018, 1023).

In conclusion, upon appellant's first proposition, we are constrained to hold that the ruling of the trial court in admitting the contract of purchase did not constitute reversible error, although the court might well have limited, by instruction, the purpose of this item of evidence.

II. Appellant next complains of certain conversations between Eaton (manager of Central States Company at Britt) and Oxley, the town clerk of Corwith. It may be observed that the Central States Company in its contract of purchase viewed the terms and provisions of the contract with Corwith as non-severable. There were various stipulations contained therein as to the future conduct of the business in furnishing current to the town. One of the provisions required the Central States to use diligence in the reconstruction of the Luverne-Corwith transmission line and substation. This was not done, as a new line was constructed, under the option granted, from Wesley to Corwith. One of the provisions recited that the said lines would always be repaired and kept and maintained in a high state of efficiency; another, that the purchaser would supply a three-phase alternating current to the town; another, that the purchaser was to rebuild the substation, after which it would always keep and maintain the substation in condition to properly and adequately deliver all the electrical energy agreed to be delivered to the town during the life of the contract. After this contract became effective, the town ceased to make any repairs, and did not concern itself with the condition of the line in question. The Central States Company did take control, and did move the substation through which the current was transmitted. The clerk, acting for the town, and Eaton, acting as manager for the Central States, had frequent meetings, for the discussion of the new status created. In one of these conversations, Eaton assured Oxley that there would be no interruption in the service, and they had a talk about continuing to take the current on the old line. Eaton told Oxley, with respect to the meter readings, that they should be sent to Humboldt, and further, that they (Central States) would make arrangements with the Humboldt Company to furnish juice until the Central States Electric Company was in a position to furnish it. Dur-.

ing this period, the vice president of the Central States was in correspondence with the officials of the Iowa Public Service Company. Mullins, general superintendent of the Iowa Public Service Company, and Ingham, superintendent of the Central States Company, had a conference. Mullins testified that instructions came from the home office at Fort Dodge for a continuation of service to Corwith,—that is, after July, 1927, when the contract of purchase by the Central States became effective, —and that the Iowa Public Service would continue to serve the Central States for any quantity of juice they wanted. His language was that the current would be served "just as long as they [Central States] want to use any, we will sell it to them." This evidence plainly indicates the acquiescence of the Central States to the continued transmission of the current, and for the purpose and in order that the appellant company could fulfill its obligation to the town of Corwith. These matters were admissible, not for the purpose of sustaining a cause of action for breach of contract, but to prove appellant's status, and to show that it requested the continuance of the transmission of the current after it had notice of the break on its line. True, the Iowa Public Service Company had a written contract with the town of Corwith to furnish it with current, but, under the record facts, the service company could not continue to furnish current unless the new owners (Central States) acquiesced in the use of its property. There was ample evidence to justify a finding by the jury that the Central States had knowledge of the service, and that they understood that the Iowa Public Service should continue to serve Corwith after the sale to it of the Luverne-Corwith line. It is undisputed that after the sale the new owner of the line was taking current at the same point (Luverne), and was sending on and delivering it through its substation. The Central States admittedly had physical possession of the purchased line and actual physical charge of the transformers and the substation long before the accident. The challenged evidence was competent, and therefore admissible. In this connection it is urged by appellant that the court erred in sustaining an objection by counsel, on cross-examination of the town clerk, Oxley, reading as follows:

"And you continued your dealings after that time, July

6, 1927, exactly with the Humboldt Company as you had before?''

The objection was made by counsel for the Iowa Public Service. The objection was based on the ground that the question called for the opinion and conclusion of the witness. It is sufficient to say that the facts, so far as they were material to the transaction, have previously been stated. We consider that the question did involve, in a sense, an opinion and conclusion; but whether it did or not, no prejudice resulted from the ruling of the court.

III. The appellant complains at considerable length that the court erred in the admission of testimony of telephone conversations with Manager Eaton at Britt. We have heretofore referred to these matters. As recited, Beebe, an Iowa Public Service operator at the Humboldt plant, and Speilman, another operator at the same plant, and Zentner, in charge of the substation at Luverne, had telephone conversations with Manager Eaton at Britt, prior to the accident. All of these conversations had reference to the trouble on the Luverne-Corwith line, which the Humboldt · operators had discovered from their readings of the ammeter at Humboldt. Beebe telephoned Britt, and asked for the manager of the Central States at that town. He talked with the person who responded to his call for the manager, and Beebe conveyed to him the facts which he (Beebe) had personally learned, involving the trouble. Later, he met Eaton, and heard him talk, and the call was discussed. The trial court, in the first instance, sustained a motion to strike the telephone conversation in question. Later, in the examination of Beebe by plaintiff's counsel, the latter reverted to the telephone conversation of Friday night, and the entire conversation was again given, and this testimony became a part of the record, without objection or exception. A critical study of this record discloses that the conversation in question was between Beebe and Eaton.

Speilman, after making the tests, was called on the telephone from Britt. The question is, who called Speilman? After the accident, Speilman identified Eaton as the person who conversed with him on the telephone. There was ample proof that the person who called Speilman was Eaton, to whom Speilman

said, in response to an inquiry by Eaton, that the Iowa Public Service Company "could carry the load until around the first of the week without doing injury to the apparatus at Humboldt," and that in this conversation Speilman was told that the Central States "would have their change made in the substation, and would have it all fixed up." As bearing on the identification of voice in telephone conversations, see *Cox v. Cline*, 147 Iowa 353; *Conkling v. Standard Oil Co.*, 138 Iowa 596; Annotation to *Theisen v. Detroit Taxicab & Transfer Co.*, L. R. A. 1918D 715; Annotation to *Planter's Cotton Oil Co. v. Western Union Tel. Co.*, 6 L. R. A. (N. S.) 1180; 4 Wigmore on Evidence (2d Ed.), Section 2155.

IV. Complaint is made of the telephone conversations between Beebe and Zentner, co-employees of the Iowa Public Service Company, the former at Humboldt, the latter at Luverne. These conversations had reference to the tests that were made at Humboldt, to discover the cause of the trouble. They were prior to the accident, and were preliminary to the call of Zentner to Eaton, of the Central States, informing him of the tests and results of the tests that had been made by the employees of the Iowa Public Service Company. There was no error here.

V. Let us turn for a moment to the refusal of the court to give the requested instructions asked by this appellant. There was, in the main, a failure to specify the grounds of such exceptions, in conformity to Section 11495, Code, 1927. We consider that, as to three of the requested and refused instructions, the exceptions were sufficiently specific, to wit: The one making reference to the admission of the contract of purchase of the Luverne-Corwith line; Requested Instruction No. 9, relative to the statutory presumption of negligence, under Section 8323, Code, 1927, against the Iowa Public Service Company by reason of its operation of the line, and that no presumption exists against the Central States; and Requested Instruction No. 10, concerning conversations between employees of the Iowa Public Service Company. The other exceptions are clearly insufficient, under the statute and its interpretation by this court. See *Griffin v. McNeil*, 198 Iowa 1359. Appellant's contentions in the instant particulars are not sustainable.

VI. Lastly, the appellant contends that the verdict is excessive. The verdict returned by the jury was in the sum of

$10,000. The trial court, on motion for new trial, believed the verdict excessive, and ordered plaintiff to file a remittitur of $1,500, or a new trial, in case  plaintiff failed so to do. A remittitur in said amount was filed. We agree that the original verdict was excessive. We further believe that, under all the facts and circumstances shown in this record, the verdict should have been reduced in a larger amount. The statute limits the recoverable damage to $15,000. Section 10464, Code, 1927. This is a mere limitation, and is not a criterion. It may be conceded that the quantum of damages is a jury question, but the verdict returned must be within reasonable limits, under the facts disclosed by the evidence. We believe that the jury failed to comprehend the case as submitted. True, the statute (Section 10463) applicable to a case of this kind involves a discretion on the part of the jury, but it is not arbitrary in character.

The evidence in the case at bar shows that the plaintiff's decedent was a beet weeder. There is no evidence of any accumulations on her part. She owned no property. She was illiterate. Some of her husband's earnings, plus some of her own, was sent to her relatives in Mexico. It is not shown how much she sent from her earnings. There is one exhibit which shows money order receipts from August 13, 1927, to March 1, 1928, amounting to $280, and Western Union Telegraph Company receipts from November 28, 1927, to January 13, 1928, in the sum of $39. The husband testified that he recalled that $300 was sent to Mexico, which he thought was sent in June, 1927, to bring his wife's sister to the United States. The husband testified that he gave his earnings to his wife, to arrange for the house accounts, and "she sent some to Mexico." It appears that the earnings of the two were held in common, and were expended by the wife as she determined. The beet season generally begins sometime in May, and lasts about 70 working days. The husband, Andreas, at the time of the accident had a contract with one Brant, to take care of 40 acres in sugar beets. The wife had intended to assist her husband in this contract. Whatever was paid to her was paid by the husband. The decedent, Mrs. Floris, and a man and woman came to Hanna to carry out the terms of the contract between Brant and the hus-

band of the decedent. The amount to be paid her by the husband is not disclosed, but it is shown that for the season's work in 1927 the husband, according to his testimony, "got 1/5 of $920" for that season. In other words, he, with four other men, worked together on the contract for that year. The husband testified that the amount he earned in 1926 and 1927 was a little more than in 1928, because this year (1928) he didn't have any help from his wife. "When my wife worked with me, I collected her pay. What she got out of it was just what I gave back to her." It is also shown that the wife, with the help of her sister and her sister's daughter, kept a boarding house for Mexicans when she was not employed during the beet season. Just prior to her death, and before her husband entered upon his contract with Brant, there were thirteen boarders and roomers in the rented house which was occupied by the Floris family. This was the greatest number she had ever had. A dollar a day per person was charged for board and room. There is no showing of any profit accruing to her through this work. The age of plaintiff's decedent is not definitely shown, although her life expectancy, based on the age of 35 years, as shown by the life tables, was about 26 years. She had no children.

The rule governing the proposition under consideration may be stated as follows:

"The jury in awarding damages cannot exercise their discretion arbitrarily, but they must proceed upon the theory of compensation for pecuniary loss to the beneficiaries, and the award must be justified by the evidence. The discretion of the jury in awarding damages is always subject to the supervisory power of the court, which will not hesitate to set aside a verdict where the damages allowed are out of all proportion to the pecuniary injuries resulting from the death to the beneficiaries, or founded upon visionary estimates, or probabilities or chances, where the circumstances of the case or the evidence produced indicates that the verdict was the result of bias or prejudice." 17 Corpus Juris 1347, Section 235.

In *Engvall v. Des Moines City R. Co.*, 145 Iowa 560, a verdict in damages for $8,250 was awarded. The decedent was a fireman, 46 years of age, with an expectancy of about 24 years. He was healthy, and able to work, and was then earning

$1,000 a year. He had accumulated property of the value of about $2,000. He had no source of income aside from his personal earnings. It is said:

"An allowance of $8,250 as the present worth of the loss to his estate for the estimated period of his life is equivalent to a finding that he would have accumulated and left to his estate, had he lived, about $20,000. During over one half of his active business life he had accumulated but $2,000, and we think there is no warrant for finding that he would have accumulated $20,000, had he lived out his expectancy."

The amount of the verdict was reduced to $6,000.

In *Rose v. Des Moines Valley R. Co.*, 39 Iowa 246, the decedent's net annual income was $263.11, and his life expectancy was a little over 38 years, and, as the court said, had the decedent lived, and continued to earn the same income during the whole time, "his estate, it is supposed, would have received the benefit of these earnings and their accumulations." It is further said:

"In estimating the damages, the jury should consider the exact situation, annual earnings, health, habits, etc., of the deceased; * * * and give full compensation for the pecuniary loss resulting to his estate from the killing. It is true that the precise loss may not be capable of exact computation; for, although the deceased may have been in good health, of good habits, and enjoying a net income as the fruits of industry and frugality, these things might not have continued during the whole, or any considerable portion, of the expected term of his life. On the other hand, a continuance of health, good habits, industry, and frugality, together with fortuitous circumstances, might have enabled him to largely increase his income from year to year throughout the entire term of the expected life, accumulating great wealth, and at his death leave a very large estate. These, however, are mere speculations, and are not to be made the basis upon which to compute the damages in cases of this kind. * * * While much is left to their sound discretion, yet they [the jury] are not authorized to found their verdict upon mere speculation."

The jury awarded a verdict of $10,000, which this court considered excessive, and reduced to $5,000.

In the case at bar, the jury was entitled to take into consideration, under Section 10463, Code, 1927, "the value of her services as a wife." The plaintiff's decedent was in good health, and industrious. Her work was necessarily manual, and her earnings were not subject to any considerable increase. The record does not disclose any fortuitous circumstances that would enable her to largely increase her earnings from year to year throughout the period of her life expectancy; but, on the contrary, as she grew older, her ability to perform manual labor would grow materially less. As heretofore stated, there is a paucity in this record to prove her actual earning ability. With these considerations in mind, it is adjudged that, if the plaintiff-administrator shall elect to file in this court a remittitur in excess of the sum of $6,000, within 30 days from the filing of this opinion with the clerk of this court, the judgment for $6,000 will be affirmed. Otherwise, the cause and the judgment heretofore entered in the district court will be reversed.

B.

I. We now turn to the brief points argued by the plaintiff-administrator on his appeal from the judgment based on the finding of the jury against the plaintiff and in favor of the defendant Iowa Public Service Company.

Three propositions are to be considered: (1) the challenge to the instruction of the trial court in the definition of reasonable or ordinary care; (2) the failure of the court to instruct as to the rebuttable presumption of negligence, as defined in Section 8323, Code, 1927; and (3) that the verdict of the jury as to the Iowa Public Service Company is contrary to the evidence and to the law.

The trial court defined negligence in language heretofore approved by this court. It defined ordinary care as consisting "in doing everything which a person of ordinary prudence and  caution would do under the circumstances, and in avoiding the doing of everything which a person of ordinary prudence and caution would not do under the circumstances." In another instruction it is said:

"While a transmission company is held to the exercise of

reasonable care and caution in the handling of transmission of electrical current, so far as to avoid injury to others, yet it should not be held as an insurer against all possible accidents that might happen to those who might be exposed to danger.''

It will be borne in mind that both defendants in the instant case were subject to the instructions given by the court. It is true that this court, in certain decisions hereinafter cited, used the expression ''high degree of care,'' but it was ordinary care, nevertheless. Negligence and care are no longer classified in this state as to ''degrees.'' In the cases cited, the error was not predicated on instructions given. The term ''ordinary or reasonable care'' simply means the care that should be used under the circumstances of the case. As said in *Graham v. Town of Oxford,* 105 Iowa 705:

: '' 'In determining what is ordinary care, there is no absolute test, but it may be considered to be that degree of care which an ordinarily reasonable man would exercise under like circumstances, in view of all the facts existing at the time.' ''

The degree of care required necessarily varies with the circumstances of each particular case, but it is ''ordinary care.''

It must be conceded that the handling or the transmitting of electric current, or the use of any highly dangerous instrumentality, obligates the user to use that degree of diligence and foresight commensurate with the danger under the circumstances. There can be no quarrel on this proposition. See *Evans v. Oskaloosa T. & L. Co.,* 192 Iowa 1, 2; *Walters v. Iowa Elec. Co.,* 203 Iowa 471; *Beman v. Iowa Elec. Co.,* 205 Iowa 730, 734. It would have been proper for the trial court to have amplified the definition given of ordinary or reasonable care; but, as a matter of definition and an abstract proposition of law, the instruction was correct, and, in the absence of a request on the part of plaintiff to amplify the given instruction, we cannot hold that the instructions given on this subject constitute reversible error.

II. It is next contended by appellee that the court erred in failing to embody in the instructions any reference to the subject-matter contained in Section 8323, which, in substance,

 recites that, in case of injury to any person or property by any transmission line, negligence will be presumed on the part of a corporation operating said line in causing said injury, "but this presumption may be rebutted by proof." Plaintiff did not elect to rely on this presumption, but proceeded to show and prove the negligence of the Service Company, and did not request the trial court to give an instruction in relation to the subject-matter of Section 8323. Failure to instruct, under such circumstances, is not reversible error. In the instant case, specific negligence was pleaded, and submitted to the jury as pleaded. The instructions given were applicable to both defendants. The determination of the fact of negligence and the corporation which was guilty of negligence was solely within the province of the jury. The jury did determine, on the evidence, that the Central States Company alone was negligent. The jury was in possession of all the causal facts in this case, and there was no need to assist them by the aid of a rebuttable presumption. The doctrine of *res ipsa loquitur* is not involved. The plaintiff relied upon a specific ground of negligence, and not upon general grounds. There was no error on the part of the court in this particular, as contended by appellee.

III. Is the plaintiff entitled to a reversal as against the defendant Iowa Public Service Company on the ground that the evidence failed to sustain the finding of the jury? We deem  it unnecessary to repeat the statement of facts heretofore recited on the appellant's appeal; but it must be borne in mind that the jury was acquainted with the fact that, on the Friday night preceding the accident, which occurred on Sunday, the Iowa Public Service Company discovered that there was trouble on the transmission line of the Central States Company; that the latter company was informed by its codefendant of the trouble,—to wit, a "bad short" on its line (Central States); that it knew of this condition Friday night, all day Saturday and Saturday night, and until the time of the accident; that the Iowa Public Service Company was doing all it could, unless it was obligated to reconstruct or repair the line which it did not own; that the Iowa Public Service

Company was told by the Central States to continue sending current to the town of Corwith over the line of the Central States; that the Central States had promised the Iowa Public Service Company at three different times that the defect, which the Central States knew existed, would be corrected by it (Central States); that the Central States attributed the defect to the substation which it owned. The jury was also acquainted with the fact that the Central States did not send its men out to locate and remedy the defect which it knew existed on its line, for the reason, as given by the manager of the Central States, that it was a stormy night, and inconvenient for his men to go out and inspect the line,—thereby, in effect, taking a chance on what might happen. These facts, and others, being known to the jury, it was its function to determine whether or not the negligence that was the proximate cause of the injury in question should be attributed to the conduct of the Central States Company, or to the conduct of the Iowa Public Service Company, or both. No one can dispute that a fact question was presented, and the jury, in consideration of all the facts, ultimately and finally determined who was chargeable with the pleaded negligence; and in so determining, it necessarily determined the proximate cause of injury to plaintiff's decedent. Had the jury found, under all the facts, that the Iowa Public Service Company was jointly liable with its codefendant, the Iowa Public Service Company would have been bound by that finding. Proper instructions were given by the trial court, and in one of the instructions the jury was told:

"If the defendants knew such facts as would cause a person of reasonable prudence to investigate and learn the cause of the trouble, then they had constructive notice of the defective condition which plaintiff claimed had existed some time before the accident. If, after receiving such notice of a defective condition, a person of reasonable prudence would have caused the electricity to be shut off said line, before the time of the accident, until it could be repaired, then the defendants were negligent in not causing the said current to be cut off."

As stated, the jury had full knowledge of all the facts, and it was its province to say whose negligence was the proximate cause of the injury. It was its province to say whether or not

the Iowa Public Service Company was acting as a reasonably prudent and cautious person would do, under the circumstances surrounding this particular situation. It is not our privilege to speculate as to the mental attitude of the jury in reaching the conclusion it did reach. It is the function of this court to determine whether or not the jury was within its province in ruling as it did, under the law and the evidence of this case. We conclude that the judgment entered on the verdict, in so far as the Iowa Public Service Company is concerned, must be, and is, affirmed.

As to the appeal of the appellant, Central States Electric Company, the judgment is affirmed on condition. As to the appeal of the plaintiff-administrator against the Iowa Public Service Company, the judgment is—*Affirmed.*

EVANS, STEVENS, ALBERT, KINDIG, and WAGNER, JJ., concur.