Argued June 1, 1964, reversed and remanded October 13,
petition for rehearing denied November 23, 1965

# WATERWAY TERMINALS COMPANY *v.*
# P. S. LORD MECHANICAL CON-
# TRACTORS ET AL

406 P. 2d 556

[1]

R. R. *Bullivant,* Portland, argued the cause for appellant. With him on the briefs were Pendergrass, Spackman, Bullivant & Wright, Darrel L. Johnson, and Douglas G. Houser.

*Howard K. Beebe,* Portland, argued the cause for respondent P. S. Lord Mechanical Contractors; *James Arthur Powers,* Portland, argued the cause for respondent Mechanical Handling Systems, Inc.; *James H. Bruce* and *Bruce Spaulding,* Portland, argued the cause for respondent Colby Steel & Manufacturing, Inc. On the respondents' briefs were the following attorneys, all of Portland: Maguire, Shields, Morrison, Bailey & Kester, William H. Morrison, Howard K.

Beebe and David C. Landis, Koerner, Young, McColloch & Dezendorf and John Gordon Gearin for P. S. Lord Mechanical Contractors; Tooze, Powers, Kerr, Tooze & Morrell, James Arthur Powers and Edwin J. Peterson (who also filed a separate brief) for Mechanical Handling Systems, Inc.; Mautz, Souther, Spaulding, Kinsey & Williamson, Bruce Spaulding and James H. Bruce for Colby Steel & Manufacturing, Inc.

Before McALLISTER, Chief Justice, and *ROSSMAN, PERRY, SLOAN, †O'CONNELL, GOODWIN and LUSK, Justices.

LUSK, J.

■ This is an action to recover damages to plaintiff's property caused by a fire alleged to have commenced and spread as the result of the negligence of the defendants. A jury trial resulted in a verdict and judgment for the defendants and plaintiff appeals. There are attempted cross appeals by the defendants from a judgment dismissing pleas in abatement filed by them. Such a judgment, being interlocutory, is not appealable, though it is reviewable on appeal from the final judgment: *McKenney v. Oregon Am. Lbr. Co.,* 209 Or 140, 143, 304 P2d 426; *Hirschfeld v. McCullagh,* 64 Or 502, 509, 127 P 541, 130 P 1131; *La Grande v. Portland Public Market,* 58 Or 126, 134, 113 P 25. The issue arising out of the pleas in abatement will be considered first.

## PLEAS IN ABATEMENT

■ By their pleas in abatement the defendants assert that the plaintiff is not the real party in interest

---

* Retired January 4, 1965.
† Did not participate in this decision.

because the fire loss was covered by policies of fire insurance issued to the plaintiff by numerous insurance companies which paid the loss and became subrogated to the claim of the plaintiff. There was a trial of the pleas in abatement prior to the trial on the merits and, as stated, the court entered a judgment dismissing the pleas.

The evidence shows that payments of the loss by the insurance companies were made pursuant to "loan receipts" similar to those considered in *Furrer v. Yew Creek Logging Co.*, 206 Or 382, 292 P2d 499. In that case we held, over the objection that such loan receipts were a mere subterfuge devised to mask the fact of actual payment of the loss by an insurance company and so to enable the insured to prosecute in his own name an action against an alleged tort feasor, that the loan receipts were valid agreements under which the title to the action remained in the insured and that the defendant was protected against another action by the insurer. We said "there is nothing inherently wrong with the use of a loan receipt in the manner and to the effect employed here." We further said:

> "Of course, defendant is entitled to assurance that it will be required to defend against this claim only once, and that payment to plaintiff will, as to it, finally settle the matter. However, this is the extent of the interest which defendant may have in any agreement of this kind, made, as it is, between two other parties who are free to contract in any lawful manner concerning their business. If plaintiff chooses to take something less than the absolute payment to which he is entitled under this policy, that is his affair, and defendant's only proper concern is that payment to plaintiff is the only one which will be required of it.

> "The reason why these parties chose to adopt

this arrangement is immaterial so far as defendant is concerned, for he is properly concerned with only one effect of it—the location of the title to the cause of action." 206 Or at 389.

The decision in the *Furrer* case was followed in *Lamb-Weston et al v. Ore. Auto. Ins. Co.*, 219 Or 110, 116, 341 P2d 110, 346 P2d 643, 76 ALR2d 485.

The present case is ruled by these decisions and the judgment on the pleas in abatement is, therefore, affirmed.

An able opinion by United States District Judge John F. Kilkenny in *Condor Investment Co. v. Pacific Coca-Cola Bottling Co.*, 211 F Supp 671 (D Or. 1962) has been pressed upon us. The court there held that our decisions on the question were not applicable to the case before it for the reason, among others, that the drafts issued by the insurance company purported on their face to be in full payment of the loss. That is true here, but we think that the language of the loan receipts clearly expressing the intention of the plaintiff and the insurance companies to treat the payments as loans is controlling. Recitals in the documents show that the parties relied on the *Furrer* case in entering into the agreements. The rule of *stare decisis* requires that there should be no departure from our former decisions.

Contrary to the contention of the defendants, we think the evidence presented no jury question and the court rightly determined the question as a matter of law.

## STATEMENT

Plaintiff, Waterway Terminals Company, an Oregon corporation, is the owner of a large dock and ware-

house on the west bank of the Willamette River in Portland, which was in course of construction in 1958. The fire—a costly one causing damage fixed at $352,540.87—occurred on the afternoon of September 11, 1958, while the defendants were engaged in performing a contract with the plaintiff for the construction of a conveyor system for the mechanical handling of cargo from dockside to warehouse. An integral part of the system were six cargo lifts designed to bring cargo from barges up to the floor of the dock. Just prior to the breaking out of the fire employees of the defendant P. S. Lord Mechanical Contractors were engaged in welding and cutting operations at one of the cargo lift installations. It is the plaintiff's basic contention that the heat generated by these operations and sparks thrown out and molten metal falling and coming into contact with the wooden structural members of the dock, some of them creosoted and highly inflammable, caused the fire to start, and that the defendants were negligent in failing to take proper precautions against this hazard. None of the defendants now claims that the evidence of negligence and causation was not sufficient to take the case to the jury, though the defendant Mechanical Handling Systems, Inc., contends, for reasons to be stated later, that it is not legally responsible for the acts of the other defendants.

As the larger part of some 650 printed pages of abstract of record and briefs is devoted to matters not directly related to the issues of negligence and contributory negligence, but to questions growing out of contracts entered into by the parties, the admission of evidence of the payment of insurance to the plaintiff, and a pleading question, it is necessary first to dispose

of the assignments of error to which these matters give rise.

The defendants will hereinafter be referred to as follows: P. S. Lord Mechanical Contractors, an Oregon corporation, as Lord; Mechanical Handling Systems, Inc., a Michigan corporation, as MHS; and Colby Steel & Manufacturing, Inc., a Washington corporation, as Colby. MHS was the prime contractor for the conveyor system. It subcontracted to Colby the furnishing and installation of the cargo lifts and Colby in turn subcontracted to Lord the job of installing the cargo lifts. The prime contract called for the payment by plaintiff to MHS of $1,070,463.

The furnishing of the conveyor system, it should be noted, was but a part of an entire project, which included construction of the dock and warehouse and a marine elevator—in all requiring the services of some 20 prime contractors and subcontractors.

## THE CONTRACT

Difficult questions are raised on the record as to the construction of provisions of the contract between the plaintiff and MHS claimed to affect the liability of the parties for loss caused by fire.

To put these questions in perspective we relate briefly the events leading up to the formation of the contract and its execution. Crown Zellerbach Corporation, of which the plaintiff is a wholly owned corporation, was providing the plaintiff with engineering advice and assistance through its Central Engineering Office and acted as agent of the plaintiff in the negotiations and in the execution of the contract.

What is described in the briefs as a "unique idea for the automated handling of barge cargos from dock

side to warehouse" appears to have been conceived by plaintiff in the latter part of 1956. The system to be developed would consist of two principal parts: Cargo lifts to bring cargo from barges in the river to wharf level and a mechanical handling system, also referred to as the "towveyor" system, to transport the cargo in carts into the warehouse. Generally, the system was automatic. Plaintiff at first invited proposals from suppliers of automated cargo handling equipment. Among the manufacturers of cargo lifts approached was Colby, which made a proposal to plaintiff on April 23, 1957.

Eventually, plaintiff decided to deal directly with MHS on the entire project, that is, the "towveyor system" and the cargo lifts, and entered into a contract with MHS to supply it. The course of dealing was as follows: Under date of October 9, 1957, Colby submitted its proposal, No. 1156-C-R1, to MHS to furnish and install six cargo lifts; on the same day MHS submitted to Crown Zellerbach its proposal, No. DE-57-548, to furnish the complete system, including the cargo lifts. The Colby proposal to MHS contained the following provisions which, the defendants contend, became binding upon the plaintiff and were breached by it:

"OWNER TO FURNISH FREE OF CHARGE

\* \* \* \* \*

"6. Any sprinkler or fire protection system that may be required by others.

"7. Fire insurance in the amount equal to the value of the equipment as required for the Manufacturer's and Purchaser's protection during the erection of the equipment."

The "owner" was the plaintiff; the "manufacturer" was Colby; and the "purchaser" was MHS.

In the MHS proposal of October 9, 1957, to Crown Zellerbach is the following reference to the Colby proposal:

## "CARGO LIFTS

"We will furnish six (6) Colby Cargo Lifts as outlined and described by Colby Steel & Manufacturing, Inc. Proposal No. 1156-CR1 dated 9 October, 1957, a copy of which is included as part of this proposal.

"We limit the material and equipment guarantees on these cargo lifts to those contained in the proposal of the cargo lift manufacturer, included herein. The guarantee limitations of these cargo lifts are described in the Colby Steel & Manufacturing, Inc. Proposal No. 1156-CR1."

A copy of the Colby proposal was physically attached to the MHS proposal to Crown Zellerbach.

In response to the MHS proposal Crown Zellerbach on October 14, 1957, submitted to MHS a document entitled "BILL OF MATERIAL", the opening paragraph of which reads:

"This specification is basically written for informative purposes only. For full details to govern refer Mechanical Handling System, Inc. proposal DE-57-548, dated October 9, 1957."

The Bill of Material contained detailed specifications for the installation of the mechanical handling system, including the Colby cargo lifts, and the following references to the Colby proposal:

"Furnish six (6) Colby Cargo Lifts as outlined and described by Colby Steel & Manufacturing, Inc. Proposal No. 1156-CR1 dated 9 October, 1957 included and made a part of this specification.

\*    \*    \*    \*    \*

"Draft of PROPOSAL NO. 1156-C-R1 Made a Part of These Specifications"

The language last quoted was inserted by Crown Zellerbach and is followed by a paragraph taken from the Colby proposal, entitled "General Conditions," then by the Colby paragraph entitled "Owner to Furnish Free of Charge," in which the insurance and fire protection clauses are found, after which there are some 13 pages of engineering and other details, apparently copied verbatim from the Colby proposal. In the Colby proposal, however, as submitted by MHS to Crown Zellerbach, the paragraph entitled "Owner to Furnish Free of Charge" appears near the end of the document after the larger part of the engineering details. Thus, in its Bill of Material Crown Zellerbach rearranged the provisions of the Colby proposal and placed the controversial insurance and fire protection clauses almost immediately below its own language making a draft of that proposal "a part of this specification."

Thereafter under date of October 23, 1957, MHS submitted its final proposal, again including the Colby proposal, which is referred to in the identical language used in the MHS proposal of October 9, 1957.

On October 30, 1957, Crown Zellerbach transmitted to MHS its purchase order, which, among other things, provided:

"Furnish and install a material handling system for the Waterway Terminals Company of Portland, Oregon as outlined and detailed by our specifications BM-5, dated October 14, 1957, its CS-1, dated October 30, 1957, and your proposal DE-57-548-R1, dated October 23, 1957, copies attached hereto, each considered and made a part of this order."

The purchase order states:

> "The provisions of this purchase order do not become effective until the enclosed letter of acceptance has been signed and returned to us."

The letter of acceptance was signed and returned by MHS on November 15, 1957.

The circuit court ruled that the agreement in the Colby proposal to furnish free of charge "any sprinkler, [or] fire protection system that may be required by others" did not "apply to any sprinkler or fire protection system during the course of construction." The effect of the ruling was to withdraw the alleged breach of that agreement as a defense. The court further held that the agreement to furnish fire insurance in an amount equal to the value of the equipment for the protection of Colby and MHS during the erection of the Colby cargo lifts was binding on the plaintiff and was breached by it, and withdrew from the consideration of the jury the plaintiff's claim for damages to the cargo lifts amounting to $147,455. The ruling is assigned as error.

*The Fire Insurance Clause.*

Concededly, the plaintiff procured no fire insurance for the protection of MHS or Colby, but only for its own protection. The plaintiff contends, however (1) that it never became bound to any of the defendants to furnish insurance on the Colby cargo lifts because the incorporation into its contract with MHS of the Colby contract was for the limited purpose of making only the specifications or engineering details a part of the principal contract; (2) that the provision should not be construed to apply if the fire was caused by the negligence of the defendants; (3) that the pro-

vision, if it became binding on the plaintiff, was waived by the defendants and defendants should be estopped to rely on it; and (4) that in any event there was no contract to provide insurance for Lord, "a mere incidental beneficiary."

As to its first point plaintiff relies upon the rule thus stated in 13 Am Jur 2d 15-16, Building, etc. Contracts § 12, that:

> "It is generally held that where a building contract refers to the plans and specifications and so makes them a part of itself, the contract is to be construed as to its terms and scope together with the plans and specifications. Where the plans and specifications are by express terms made a part of the contract, the terms of the plans and specifications will control with the same force as though physically incorporated in the very contract itself. *Where, however, the plans and specifications are referred to in the contract for a particular specified purpose, such specifications can serve no other purpose than the one specified, and are foreign to the contract for all other purposes.* * * *" (Italics added.)

Plaintiff argues that the references to the Colby proposal to MHS were intended only as a means of describing the engineering specifications for the construction and installation of the cargo lifts and did not incorporate contractual provisions accompanying such specifications. Two Oregon decisions are cited as supporting this view. In *Myers v. Strowbridge Estate Co.,* 82 Or 29, 160 P 135, there was a lease containing an agreement under which the lessee was to alter and improve the leased premises. The lessee entered into a contract with another for the performance of the plumbing work. Such contract provided:

> "The contractor shall and will provide all the

materials and perform all the work  \*  \*  \* as shown on the drawings and described in the specifications prepared by H. M. Fancher, Architect, which drawings and specifications are identified by the signatures of the parties hereto, and become hereby a part of this contract.  \*  \*  \*" 82 Or at 35.

The court said:

"The rule seems to be well established that where reference is made in one document to another *unattached* document for a specific purpose only, such other document becomes a part of the former for such special purpose only." (Italics added.) 82 Or at 43.

Not only was the document unattached, but the reference plainly was to the "drawings and specifications," *prepared by an architect,* which alone, the parties agreed, were to "become hereby a part of this contract." Therefore, it was held that a provision in the lease exempting the lessor from any claim arising out of liens did not become a part of the plumbing contract. Similarly, in *Wallace v. Oregon Engineering Co.,* 90 Or 31, 174 P 156, 175 P 445, a provision in a subcontract read that "all work shall be done in accordance with the plans and specifications" as outlined in the prime contract, "which contract is hereby referred to and made a part of this agreement *so far as appertaining hereto.*" (Italics added.) 90 Or at 33. The court held, in construing this language, that a provision in the prime contract against assignment of the contract or subletting any part of it did not become binding on the subcontractor.

Not only was the Colby proposal physically annexed to the two MHS proposals and the Crown Zellerbach Bill of Material, but, unlike the cases relied on by the plaintiff, the reference is general, not specific. See

*Valley Const. Co. v. City of Calistoga,* 72 CA2d 839, 841, 165 P2d 521.

■ It might well be argued that the word "specifications" as understood by Crown Zellerbach was not limited to engineering details, for in its Bill of Material, which included contractual provisions having no relation to engineering, it designated that document as "this specification." This aside, it was not the specifications, that is, the engineering details, to which reference was made in the MHS-Crown Zellerbach contract. It was the Colby *proposal,* which included both engineering details and general contractual provisions, that was incorporated by reference in the principal contract. When to this is added the deliberate act of Crown Zellerbach in inserting in the Bill of Material its own language of adoption of the Colby proposal and rearranging the provisions of that proposal in the manner above described, there can be no doubt of Crown Zellerbach's conscious purpose to include in its undertaking the fire insurance and fire protection clauses and that these provisions became a part of the contract as ultimately entered into.

■ As previously stated, plaintiff contends that the fire insurance clause was not intended to apply if the fire was caused by the negligence of the contractors. To determine this question consideration must be given to the contract as a whole. Pertinent provisions are the following:

"21—LIABILITY
"Supplier is not to be held liable for any loss, damage or delay due to transportation, accident, fire strike, civil or military authority, insurrection, or any cause beyond their control."

"Should the material and equipment, or any part

thereof, included in this proposal, be damaged or destroyed after it has been received by you, by fire, the elements or any other cause, unless such damage or destruction be caused by our [MHS] active fault or negligence, then and in that event you shall forthwith pay us for all work then performed and all materials then used or provided for use in connection with the execution of the work covered hereby, whereupon we shall deliver to you all such material and equipment as is included in such payment and as has not been delivered to you, transportation charges thereon to be paid by you or by us as specified in the first paragraph of this paragraph 16."

"INDEMNITY. Seller [MHS] agrees to indemnify and save and hold harmless the Buyer, its officers, agents and employees from any and all claims, charges, liabilities and/or damages of any kind or nature whatsoever on account of the operations of Seller, his subcontractors, or his or their agents or employees, arising out of or growing out of the performance, malperformance, and/or nonperformance of this purchase order, or the supplying of material, or performing work under this purchase order, Seller also agrees that if Seller or his subcontractors, agents, or employees are required to be present on Buyers premises, or perform work with any of Buyer's employees, that Seller will secure and maintain in full force and effect during the performance of any work involved in connection with this purchase order, adequate public liability and property damage insurance satisfactory to Buyer, which insurance shall not name Buyer as an additional insured."

The indemnity clause is included among a number of general conditions printed on the reverse side of the Crown Zellerbach purchase order.

The clause first above quoted, which is referred to by counsel as the exculpatory clause, was obviously

intended to relieve the contractors from liability for losses from the causes therein enumerated which they otherwise would have had to bear. See *Collins v. Post et al,* 227 Or 299, 303-304, 362 P2d 325; 13 Am Jur 2d 67, Building, etc. Contracts § 64; Annotation 53 ALR 103. A similar provision in a roofing contract was held by this court not to exempt the contractor from loss by fire caused by his negligence: *Oregon Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 334 P2d 186.[1] This decision is in accord with the rule in this state that a presumption will be indulged against an intention to contract for immunity from the consequence of one's own negligence and that a contract will not be given that meaning unless so expressed in unequivocal language: *Southern Pac. Co. v. Layman,* 173 Or 275, 280, 145 P2d 295. See, also, *So. Pac. Co. v. Morrison-Knudsen Co.,* 216 Or 398, 410, 338 P2d 665; *U. S. Fid. & Guar. Co. v. Thomlinson Co.,* 172 Or 307, 324-325, 141 P2d 817; *Glens Falls Indem. Co. v. Reimers,* 176 Or 47, 53, 155 P2d 923; Annotation, 175 ALR 8, 19, 29-32, 89-92, 144-149. It is in accord also with what we deem to be the weight of authority touching the construction of similar provisions in leases: *Morris v. Warner,* 207 Cal 498, 279 P 152; *Carstens v. Western Pipe & Steel Co.,* 142 Wash 259, 252 P 939; *Winkler v. Amusement Co.,* 238 NC 589, 79 SE2d 185; *Brophy v. Fairmont Creamery Co.,* 98 Neb 307, 152 NW 557, LRA 1918A 367; *VanWormer v. Crane,* 51 Mich 363, 16 NW 686, 47 Am Rep 582.

So construed, the exculpatory clause harmonizes with the provision above quoted relating to the payment by plaintiff for equipment and material damaged

---

[1] The clause read: "The contractor shall not be responsible for delays or damages due to strikes, fire, accidents or causes beyond his reasonable control,  *  *  *."

or destroyed by fire after it has been received by the plaintiff unless such damage or destruction is caused by the negligence or active fault of the contractors, and with the indemnity clause under which MHS agreed to indemnify and save harmless the plaintiff from "damages of any kind or nature whatsoever on account of the operations of Seller, his subcontractors," etc. If the insurance clause is construed to relieve the contractors from liability for negligence in causing a fire, as the defendants contend, there is conflict between it and the provisions just discussed. This would also be the case if the indemnity clause were to be construed, as counsel for plaintiff suggest it should be, as applicable only to negligent conduct of the contractors.

Pointing to the duty of the court to give effect to every provision of a contract where that is possible: *Moore v. Schermerhorn*, 210 Or 23, 31, 307 P2d 483, 308 P2d 180, 65 ALR2d 715; *Hardin v. Dimension Lbr. Co.*, 140 Or 385, 389, 13 P2d 602, plaintiff argues that the construction of the insurance clause urged by it will bring harmony out of this seeming conflict. But this would be to put a meaning upon fire insurance contrary to common understanding, and, so far as we know, to the universal practice of insurance companies. See the standard fire insurance policy prescribed by ORS 744.100; The Liability of The Tenant, 31 Boston U. L. Rev. 47, 50. Beyond this, a fire insurance policy which excluded from the coverage a negligently caused fire would afford the contractors no protection that they did not already have under the exculpatory clause, for that clause, without doubt, relieves them from liability for loss due to a fire not caused by their negligence.

In several recent cases the courts have held that an agreement of the parties to a lease obligating the landlord to carry insurance on the leased premises is a complete defense to an action by the landlord, or by his insurer as subrogee, against the tenant for negligence in causing a fire which damaged or destroyed the leased premises: *General Mills v. Goldman,* 184 F2d 359 (8th Cir. 1950); *Cerny-Pickas & Co. v. C. R. Jahn Co.,* 7 Ill 2d 393, 131 NE2d 100; *United States Fire Ins. Co. v. P.-M. Corp.,* 166 Ohio St 85, 139 NE2d 330; *Kansas City Stock Yards Co. v. A. Reich & Sons* (1952, Mo) 250 SW2d 692. The courts reasoned that such a provision meant that a fire loss, whether caused by negligence of the tenant or not, would be paid out of the proceeds of the insurance. There was also involved in the first three of the cited cases[2] the usual surrender clause requiring the lessee to return the premises to the lessor at the end of the term in good condition "loss by fire and ordinary wear excepted." The court in *General Mills v. Goldman,* which is considered the leading case on this subject, while conceding that in some circumstances such a provision might not, under a strict construction, relieve the tenant from liability for fire caused by his negligence, said:

> "But there is no public policy in Minnesota inimical to resort to fire insurance covering loss by fire occurring with or without negligence and there is no reason for applying any 'strict construction' to a lease entered into in contemplation of having a fully appreciated and guarded against fire risk carried by an insurance company. The undisputed evidence in this case presents exactly that situation. The landlords here agreed that the

---

[2] These cases were decided by divided courts. Judge Sanborn's dissent in the General Mills case was followed in Winkler v. Amusement Co., supra.

tenant should not be liable to pay for 'loss by fire' because it was understood between them that fire insurance would be taken out and a fire insurance company would be required to pay for any 'loss by fire' occurring on the premises during the term of the lease. Such insurance company would be required to pay whether the 'loss by fire' was caused by negligence or not as fire insurance universally covers loss by fire occurring from the kind of negligence here involved." 184 F2d at 364-365.

As Mr. Justice Schaefer said in *Cerny-Pickas & Co. v. C. R. Jahn Co.*:

"The parties contemplated that the risk of loss by fire should be insured against and we see no reason to suppose that they did not contemplate the customary insurance policy which covers both accidental and negligent fires." 7 Ill 2d at 398.

There was an element present in these cases not found here, except by possible inference. In all of them the agreed rental included an amount for payment of the fire insurance premiums. Thus, in effect, the tenant bore the cost of the insurance. We think, however, that the controlling consideration in the decision of these cases was the general understanding of what fire insurance means. It cannot be assumed that in negotiations for a contract a party knowingly asks for something which would be of no value to him. That would be this case if the plaintiff's construction of the insurance clause were approved.

■■ This results in apparently irreconcilable provisions. It is to be borne in mind, however, that the provision which impliedly, at least, imposes liability on the contractors for a negligent fire, and the indemnity clause, apply in terms to the entire contract, while the

insurance clause applies only to the cargo lifts. It is, therefore, a case for application of the rule thus stated in 3 Corbin on Contracts 176, § 547:

> "If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former."

See, also, Restatement, Contracts § 236 (c); *Union Pacific Railroad Co. v. Bridal Veil Lumber Co.*, 219 F2d 825, 829 (9th Cir. 1955). Under this principle the insurance clause is to be regarded as taken out of the general provisions and a complete defense to the claim of the plaintiff to recover for damage to the cargo lifts at least as against MHS and Colby, unless this defense was waived or the contractors are estopped to raise it. Whether Lord is entitled to the benefit of this defense will be considered later.

*Estoppel and Waiver.*

After the fire, but before this action was filed, plaintiff employed Colby to repair or replace the three damaged cargo lifts and Colby subcontracted the job to Lord. Pending formal agreement upon these matters, Colby obtained from plaintiff a writing releasing both Colby and Lord from liability for "damage to our property caused by fire," and other specified causes, "arising out of your operations but only to the extent of the coverage afforded us under our fire insurance policies." The effect of this writing was to waive subrogation rights of plaintiff's insurers, pursuant to what is referred to in the record as the "practically standard" subrogation waiver clause in fire

insurance policies,[13] but only with respect to future operations of the contractors. Plaintiff paid Colby $147,455 for the repair work.

Also, after the fire and before this action was filed, plaintiff made a progress payment to MHS of $213,092.60 for work done before the fire. In a letter to MHS enclosing its draft, plaintiff wrote that the payment was made "with the distinct understanding that it does not constitute a waiver of rights or future claims [arising out of the fire] that may exist in our favor or in favor of our insurance carriers."

In various ways, plaintiff raised the question on the trial that the acceptance and retention of these payments by MHS and Colby, while remaining silent as to the defense of the insurance clause, estopped them from afterwards asserting such defense. Adverse rulings by the court are assigned as error.

■■ Defendants' silence could not be the basis for a claim of estoppel unless they had a legal duty to speak: *Earls et ux v. Clarke et al,* 223 Or 527, 532, 355 P2d 213. Neither expressly nor by implication did the plaintiff condition its acts in making the payments in question or obtaining the waiver of its insurers' subrogation rights on the abandonment by the defendants of the defense of the insurance clause or any other defense they might have to an action to recover for the fire loss. The clear and evident purpose of the

[13] "13. 'SUBROGATION CLAUSE'—Without prejudice to this insurance the Insured may release, prior to loss, any corporation, firm, individual or other entity from liability for loss caused by act or neglect of themselves or their employees, agents, or representatives. All right of subrogation is hereby waived under this policy against any corporation, firm, individual or other entity to which or to whom coverage is afforded under this policy or against any corporation, firm, individual or other entity parent or subsidiary to, owned or controlled by or affiliated with the Insured."

letter accompanying the progress payment was to reserve the rights of plaintiff and its insurers to bring such an action as against any possible claim that the payment constituted a waiver of such rights. In neither instance did the recipient of the payment have a legal duty to say: "If you sue us, we will plead the insurance clause as a defense."

Estoppel is also urged because, it is said, plaintiff, in reliance on the fact that defendants took out their own fire insurance and in reliance on provisions of its contract with MHS and of the MHS-Colby subcontract by which the contractors agreed to be responsible for damages to plaintiff's property, failed to obtain insurance on the cargo lifts. There is no evidence to support these contentions and they are wholly inconsistent with plaintiff's position that the insurance clause never became a part of the plaintiff's contract with MHS.

Plaintiff's claim of waiver of the insurance clause is predicated upon the acceptance by Colby of certain General Conditions insisted upon by MHS in their subcontract and the rejection by MHS of Colby's request to incorporate in that contract a similar insurance clause.

Summarized, these provisions are as follows: Acceptance of final payment by Colby is made a waiver of all claims against MHS and the plaintiff and MHS was authorized to withhold payment in an amount necessary to protect itself from loss on account of damage to MHS, the plaintiff and their contractors and subcontractors. Colby agreed to be responsible for its work and material, tools, etc., used in connection with the work. Colby agreed to secure MHS and plaintiff from liability or damage for injury to person or

property and to carry workmen's compensation, public liability and property damage and automobile public liability insurance in stated amounts and, in substance, to indemnify MHS and plaintiff from claims and damage resulting from the carrying on of the work. Colby assumed all responsibility for the protection of material supplied to it by MHS or plaintiff, agreed to replace or refinish materials or workmanship of unsound character or which might become damaged after they were in place, and before final acceptance, and to bear the expense of doing so and of delays and making good other work affected by the damages, and to be responsible for all damage to other work caused by its work or workmen.[4]

■ Waiver, as distinguished from estoppel, is the intentional relinquishment of a known right: *Smith v. Martin,* 94 Or 132, 141, 185 P 236; *Mitchell v. Hughes,* 80 Or 574, 580, 157 P 965. It must be manifested in some unequivocal manner: *Smith v. Martin,* supra; 5 Williston on Contracts (3d ed, Jaeger) 240, § 678; 56 Am Jur 123, Waiver § 22.

■ There was no express waiver and no foundation in the evidence for the assertion in plaintiff's brief that MHS in its negotiations with Colby was acting as agent for plaintiff. The applicable rule was stated in *McMillan v. Montgomery et al,* 121 Or 28, 32, 253 P 879 (quoting from 27 RCL 909-910):

"* * * 'in the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party whose rights

---

[4] Colby contends that these conditions, while a part of the MHS proposal to it, were waived by MHS. We do not agree. In our discussion of another assignment of error to be later considered, where this question arises again, we will state our reasons for this conclusion.

would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. To make out a case of waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part.' * * *"

Colby's intention *not* to waive plaintiff's agreement to provide fire insurance for the cargo lifts was manifested by its endeavor to obtain a similar agreement from MHS; that it abandoned its effort to secure this additional protection from MHS is no evidence of an intention to release its existing right. And we think it quite as obvious that neither by yielding to the demands of MHS to be responsible for damage to property involved in the work nor by agreeing to any of the other General Conditions did Colby intend to release such right, which related only to the event of destruction of such property by fire.

We conclude that the trial court did not err in withdrawing from consideration of the jury the claim for damages resulting from destruction of the cargo lifts against the defendants MHS and Colby.

*Third Party Beneficiary.*

The fire insurance clause was an express agreement of the plaintiff to furnish fire insurance "for the Manufacturer's (Colby's) and Purchaser's (MHS's) protection." Lord, a subcontractor under Colby, claims that it is a beneficiary of this agreement although subcontractors are not mentioned. We think the contention cannot be sustained.

The only decision of this court cited by the defendants in support of their position is *Phez Co. v. Salem*

*Fruit Union,* 103 Or 514, 201 P 222, 205 P 970, 25 ALR 1090, from which the brief quotes the following statement relative to the elements essential to a contract enforceable by a third party:

> "(1) There must be an intention to benefit the third party. (2) The promisee must owe some obligation to the third party." 103 Or at 547.

The *Phez Company* case came before the court again and the earlier decision was overruled: 113 Or 398, 233 P 547. See The Restatement of the Law of Contracts with Oregon Notes, by Charles G. Howard, 12 Or L Rev 263, 271. In the second *Phez Company* case the court stated the rule more narrowly (see 113 Or at 419), and in numerous cases before and since the rule has been approved as announced by Mr. Chief Justice ROBERT S. BEAN in *Parker v. Jeffery,* 26 Or 186, 189, 37 P 712:

> "The doctrine, however, is not applicable to every contract made by one person with another from the performance of which a third person will derive a benefit, but is limited to contracts which have for their primary object and purpose the benefit of a third person, and which were made for his direct benefit."

In the *Parker* case the court held that a materialman could not recover against a surety on a contractor's bond for material furnished to the contractor to be used on the job. See, also, *Pankey v. National Surety Co.,* 115 Or 648, 239 P 808; and *Tait & Co. v. D. Diamond Corp.,* 228 Or 602, 365 P2d 883. In the latter case we expressly refused to overrule our former decisions and to adopt the broader rule advocated in 4 Corbin on Contracts 163-164, § 798, and which is set out in 228 Or at page 604.

In other recent cases, however, there is indication of a tendency toward relaxation of the strictness of the doctrine of the earlier decisions: *Johnson v. Doughty*, 236 Or 78, 83, 385 P2d 760; *Prouty Lbr. & Box Co. v. McGuirk*, 156 Or 418, 427-428, 66 P2d 481, 68 P2d 473. Both these decisions cite as authority the Restatement, Contracts § 133, which reads in part:

"(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, except as stated in Subsection (3):

"(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary;

"(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the Statute of Limitations or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds;

"(c) an incidental beneficiary if neither the facts stated in Clause (a) nor those stated in Clause (b) exist."

Even under the Restatement rule, Lord's contention cannot be sustained. Lord, of course, could not claim to be a creditor beneficiary and it is not a donee beneficiary because there is nothing in the present record to indicate that the purpose of either Colby or MHS

in obtaining the promise of the plaintiff was "to make a gift" to Lord or to confer upon Lord "a right against the promisor." This is not because Lord did not become Colby's subcontractor until several months later —we recognize that it is not essential that the beneficiary be known at the time the agreement is made: *Erickson v. Grande Ronde Lbr. Co.,* 162 Or 556, 575, 92 P2d 170, 94 P2d 139, but because there is nothing to indicate that either Colby or MHS had in mind a benefit to anyone other than themselves. Had it been otherwise, subcontractors could, and probably would, have been mentioned, as they are mentioned elsewhere in the contracts in evidence.

"An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." Restatement, supra, § 147; *Haines v. Pacific Bancorporation,* 146 Or 407, 414, 30 P2d 763; Corbin, supra, 10-12, § 775. It is difficult to perceive that Lord was even an incidental beneficiary; rather, this is a case to which might well be applied the admonition of Professor Corbin:

> "An attempt by a third party to become a beneficiary by strained and unusual interpretation, expanding the terms of the promise and increasing the extent of the promised performance, should always fail. Such third persons are not even 'incidental' beneficiaries; they are merely 'would-be' beneficiaries." Corbin, supra, 42, § 779C.

The cases from other jurisdictions cited by defendants do not support their contention.[9] In each of them

---

[9] Visintine & Co. v. New York, Chicago & St. Louis R. Co., 169 Ohio St 505, 160 NE2d 311; Grauwiller Transp. Co. v. Gallagher Bros. Sand & Gravel Corp., 153 F2d 384 (2d Cir. 1946); M. T. Reed Const. Co. v. Virginia Metal P. Corp., 213 F2d 337 (5th Cir. 1954).

there was evidence of a direct promise to perform a service for the third party claiming the benefit of the promise.

An argument is made by the defendants based on a misplaced apostrophe in the insurance clause, as it appears in the Crown Zellerbach Bill of Material. It there reads that the owner will furnish free "Fire insurance in the amount equal to the value of the equipment as required for the *Manufacturers'* and Purchaser's protection \* \* \*." (Italics added.) The use of the plural possessive in writing "Manufacturers' " is said to indicate that Crown Zellerbach realized that there was to be a Colby subcontractor and took this means of manifesting the intention to extend the benefit of the insurance clause to such subcontractor. We do not agree. The placing of the apostrophe after the "s" was obviously a stenographer's error. It was corrected in the very next sentence of the Colby proposal and again on the last sheet where "the Manufacturer's Field engineer" is referred to. In the Colby proposal as drafted by Colby there is a reference clause which reads: "The MECHANICAL HANDLING SYSTEMS COMPANY of Detroit, Michigan, is referred to herein as the Purchaser, and Colby Steel & Manufacturing, Inc. of Seattle, Washington, as the Manufacturer." In redrafting the Colby proposal for the purpose of its Bill of Material Crown Zellerbach omitted this reference clause. However, it was restored in the copy of the Colby proposal which was attached to the final proposal of MHS dated October 23, 1957, and there the word appears as "Manufacturer's". There was only one manufacturer and that was Colby. The contention to the contrary is so obviously without merit that it is a little surprising that it should be advanced

by counsel of the learning and experience of those representing the defendants in this case.

We think the court erred in holding that Lord was entitled to the benefit of the fire insurance clause.

*The Fire Protection Clause.*

As stated, the trial court held that there was no breach of the agreement to furnish a sprinkler or fire protection system and with that ruling we are inclined to agree. It is unnecessary to decide the question, however, as the judge submitted to the jury an allegation in the defendants' answers that the plaintiff was guilty of contributory negligence in failing to have the automatic sprinkler system functioning at the time the fire started. As will hereinafter be shown, it was proper to submit this issue to the jury and the defendants, therefore, had the full benefit of any claim that they might have asserted based on a breach of the contractual provision.

## ADMISSION OF EVIDENCE OF INSURANCE

Answers filed by each of the defendants set up several separate affirmative defenses in which the defendants alleged the exculpatory and fire insurance clauses of the contract; that the plaintiff secured fire insurance in accordance with the agreement and received payment under such insurance for the benefit of all parties affected by the fire and that thus plaintiff had received full satisfaction for the damage for which it sought recovery. It was further alleged that the insurance companies issuing the policies of insurance waived all rights of subrogation which they might have against any person to whom coverage was afforded under such insurance and that plaintiff failed and neglected to provide insurance coverage under such

policies for any of the defendants. For all these reasons it was alleged that the defendants were entitled to an offset in the amount of the proceeds of such insurance against any judgment to which the plaintiff might be entitled.

As a further defense it was alleged that the insurance policies contained a subrogation clause identical with that set out above in the discussion of estoppel. The defendants alleged that the insurance companies issuing the policies knew of the plaintiff's agreement to provide insurance for the parties furnishing and installing the lifts and included the provision above quoted in the policies in order to enable plaintiff to fulfill its agreement and thereby "said insurance companies did in fact waive all rights of subrogation against" the defendants. It is then alleged, in substance, that in order to deprive the defendants of the benefits of the proceeds of such insurance the plaintiff and the insurance companies agreed that they would "pretend" that the amounts paid to plaintiff by the insurance companies were loans and that plaintiff, as agent for the companies, would, without disclosing such agency, bring action against the defendants and, if successful, would repay to the companies the amount of the pretended loans but would not be so obligated if unsuccessful; that this action was brought in plaintiff's name solely for the benefit of the insurance companies and plaintiff is barred by the "subrogation clause" from further recovery of any moneys for the fire loss.

To these answers the plaintiff set up an equitable reply pursuant to ORS 16.460. On motions of defendants the equitable reply was stricken and this ruling is made the subject of an assignment of error which is

argued at great length in plaintiff's briefs. For reasons that will later appear it is not necessary to set forth in any detail the allegations of the equitable reply.

On the trial Joseph L. Guthrie, Project Engineer for Crown Zellerbach, was a witness for the plaintiff. In his direct examination he testified:

"Q Well, what is the total that was necessarily and reasonably disbursed for the repair of the fire damage?

"A $352,540.87.

"Q Has any part of that been repaid to you by any defendant?

"A No, not that I know of."

On cross-examination the following occurred:

"Q (By Mr. Morrison) Now, one other question. The last question that Mr. Bullivant asked you was this amount of damages of some $352,540.87 been paid to you by any of these defendants, and your answer was no. I will ask you as a matter of fact the drafts were issued by your fire insurance companies to your company for the full amount of that amount?

"MR. BULLIVANT: It's objected to as immaterial.

"THE COURT: Objection overruled.

"MR. BULLIVANT: If the Court pleases, are we trying—

"THE COURT: Mr. Bullivant, I don't care to hear argument. I think this matter has been fully argued prior to this time, and that's the reason I acted so quickly on the objection.

\* \* \* \* \*

"A My answer was no, not to my knowledge, and I don't know whether any of this money was

paid by an insurance company or anyone else to these defendants."

Thereafter, over the repeated objections of counsel for plaintiff, the court received in evidence nine proofs of loss submitted by plaintiff to nine insurance companies, 18 drafts in amounts totaling $352,540.87 issued by the insurance companies to the plaintiff pursuant to the loan agreements, 18 loan agreements, and a copy of the subrogation clause which appears as an endorsement on each of nine insurance policies, all of which had been introduced in evidence at the trial of the pleas in abatement. These documents were read to the jury *in extenso* and take up many pages of the transcript of testimony.

It should be observed at this point that, while the only objection made to the question put to the witness Guthrie was that it was immaterial, the position of counsel for plaintiff on the admission of evidence relating to plaintiff's insurance had theretofore been presented to the court, which, as indicated by the court's statement above quoted, was fully aware of the position of counsel for the plaintiff that introduction of such evidence was not only immaterial, but irrelevant and prejudicial. An additional ground of objection was that admission of the evidence violated the order of proof, inasmuch as it was admissible, if at all, only in defendants' case in support of their affirmative defenses; but this objection need not be further noticed, as we are of the opinion that the evidence was irrelevant and prejudicial. The trial judge may or may not have come to the same conclusion some ten days later on in the course of the trial when he ruled that "because of the plaintiff's failure to do that" (that is, furnish fire insurance on the cargo lift equip-

ment) there could be no recovery for the damage to that equipment and that he would so instruct the jury. At any rate, the court, in its charge, instructed the jury as follows:

> "You are not to consider in any way whatsoever any statements or evidence of insurance. You are not to consider the kind or amount of insurance that any party had or it was claimed that any party had. This evidence in these statements are [sic] not concerned with any issues remaining to be determined by you."

As we have already held, the breach of the plaintiff's agreement to furnish fire insurance on the cargo lift equipment for the protection of MHS and Colby is a complete defense to the action so far as it related to that portion of the loss. This is the ground of decision of the landlord-tenant cases upon which the defendants rely, and not that the proceeds of insurance which the promisor obtained solely for his own protection constitute a trust fund for the promisee. That plaintiff procured policies of insurance for its own protection is, therefore, completely irrelevant. The affirmative answers of the defendants alleging payment of insurance to the plaintiff and the evidence introduced in support thereof were, regardless of the intentions of the defendants in asserting these defenses, in their necessary effect, an attempt to relitigate the issue adjudicated in the trial of the pleas in abatement. The attack on the judgment denying the pleas is scarcely disguised in the separate answer which challenged the "pretended" loan transactions between the plaintiff and the insurance companies and alleged that plaintiff, in instituting this action, was acting as agent for the insurance companies. This was the very question raised by the pleas in abatement. By this answer

a contention or an argument is advanced which might very well be sustained in jurisdictions that frown upon such arrangements, but is of no avail in this state where they are approved.

The subrogation clause gives the defendants no aid. There is no evidence to support the allegation of the answers that the insurance companies waived their rights of subrogation against the defendants. The subrogation clause itself permits the insured to release anyone from liability for loss caused by negligence "prior to loss" without prejudice to the insurance. No such release was ever executed by the plaintiff. The clause also waives the insurer's right of subrogation against anyone to whom coverage is afforded under the policy or against "any corporation, firm, individual or other entity parent or subsidiary to, owned or controlled by or affiliated with the Insured." None of the defendants was so covered or comes within this description, and the argument advanced at the trial that the defendants, by virtue of their contractual relationship with the plaintiff, were "affiliated with the Insured" has been properly abandoned in this court. The whole argument about the insurance companies' release of their subrogation rights is, in truth, beside the point, for it rests upon the erroneous premise that the insurance companies were the real parties in interest, who had paid the loss and were without recourse against the defendants.

That admission of the evidence was prejudicial there can be no doubt. We need not cite any of the numerous cases in which we have held that the injection of insurance into the trial of a case where it is irrelevant is ground for reversal. Ordinarily, these cases have involved personal injury and liability insur-

ance. The rule may apply as well to evidence of fire insurance. Here, the prejudicial effect of the evidence is obvious. It not only served to divert the minds of the jury from the sole issues of negligence and contributory negligence which they were called upon to try, but it gave to the plaintiff the character of a pretender seeking to recover for a loss for which it had already been fully reimbursed, and attempting to conceal the true situation from the jury. And, although the court in the end instructed the jury to disregard the evidence, we think that no instruction, however strongly worded, could have had the effect of erasing the evidence from their minds or mitigating its influence on their verdict.

We hold that the ruling complained of was reversible error.

The equitable reply to which we have referred had as its purpose transferring to the equity side of the court—and thus keeping away from the jury—the trial of the issues concerning the payment of insurance made by the defendants' answers. We need not stop to determine whether, in the then state of the pleadings, the order striking the equitable reply was erroneous. It is sufficient to say now that, in view of our disposition of the insurance question, the objectionable features of the affirmative answers are eliminated and there is no longer need for the plaintiff to attempt to resort to equity.

## CONTRIBUTORY NEGLIGENCE

While, as above stated, it is not contended that the evidence of negligence and causation was insufficient to take the case to the jury, it is necessary to state that evidence as briefly as possible for the bearing

it has upon some of the assignments of error. One of these is directed to the court's refusal to give plaintiff's requested instruction withdrawing from the jury defendants' charges of contributory negligence.[⊛]

On the day of the fire, September 11, 1958, the entire construction project was nearing completion. The cargo lift wells, numbered 1 to 6 commencing downstream, were about 180 feet apart. The fire occurred at cargo lift number 4 about three o'clock in the afternoon of a hot day during a period of warm dry weather. There were two channel guides, as they are called, for each lift bolted to heavy vertical timbers on the dock face, one on the upstream inshore and the other on the downstream inshore side of the well. Because the guides were installed below the level called for by the specifications they did not reach the floor of the dock and it became necessary to weld extensions to their tops about ten inches in length.

This work was done by Lord's employees, Arlen W. Snyder, a welder, and Edward Garbrick, a "burner" or cutter, who also acted as fire watch. The welding job at one or both of lifts number 5 and 6 had been completed on the morning of September 11 or the day before. In the well of lift number 4 the men worked from a platform about 30 or 36 inches below the deck of the dock. According to their testimony, they had to back off the guide from the vertical timber supporting

---

[⊛] Summarized, the charges were as follows:

   a.  Causing waste and debris to be accumulated;

   b.  Causing timbers to be excessively creosoted and failure to warn of this condition;

   c.  Failing to have the automatic sprinkler system functioning and failure to warn of this condition;

   d.  Failing to furnish adequate fire fighting tools;

   e.  Failing to prohibit smoking;

   f.  Failing to have a fire prevention plan; and

   g.  Failing to maintain fire fighting access.

it by loosening the bolts which secured it to the timber and then to insert a piece of corrugated sheet metal to serve as a shield protecting the timber from the heat generated by the welding. They had finished the job on the upstream guide for lift number 4 and were preparing to make the weld on the downstream guide when, possibly twenty minutes later, they discovered the fire below the deck in the immediate vicinity of the place where they had been working.

There is evidence that the sheet metal did not serve its purpose, as it extended only to the point of the weld, so that the heat, rising to temperatures as high as 2700 degrees Fahrenheit, came directly in contact with the supporting timber. The sheet metal was spot welded to the guide and after the weld was completed it was necessary to trim it off by a burning or cutting process which caused considerable sparks and slag. There was evidence of an exceptionally deep burn in the timber immediately behind the weld. Expert testimony produced by the plaintiff was to the effect that the heating of the channel iron in immediate contact with the wood was the cause of the fire.

Fire hoses had been installed by one of the contractors in racks along the shore side of the dock. They were to be a part of the permanent equipment of the structure, but were available for use if needed during the construction period. The hoses were 75 feet long and spaced about 180 feet apart. They were standard fire hoses with a plain nozzle which could be screwed on and off. Plaintiff had also made available to the contractors for fire protection two chemical fire extinguishers on carts. When the fire started one of these was about 50 feet downstream from cargo lift number 4 and the other about 215 feet distant upstream.

There was competent evidence that the standard practice in electric arc welding and cutting operations on docks is to insert an asbestos sheet between the metal and the timber; to have near at hand a fire extinguisher and "a quick action nozzle on the end of the hose with the pressure on" (known as a "live hose"); to wet down the area, both before and after the welding operation has been completed; to keep one or two men patroling the area of the operation for an hour and to station a man below the floor level of the dock when there is danger of falling sparks or slag.

The record shows that the area was not wetted down before, during or after the operation. There was no live fire hose or fire extinguisher immediately at hand and no watch was posted below the dock floor. The men did, however, provide themselves with a 5-gallon bucket of water, which was wholly inadequate.

Immediately upon discovering the fire Snyder and Garbrick brought into play the nearest fire extinguisher and a fire hose. The hose itself was not long enough to reach the fire, but the water from the hose did. Snyder testified it reached the weld of the upstream channel guide. Hoses were also manned by other workers. One of these was the nearest hose upstream from cargo lift number 4, but, as the witness Snyder testified, it "had to be abandoned before long because the fire got up through the main deck." It was a very hot fire due, no doubt, to the creosoted pilings, braces and other structural members. It "spread incredibly fast," but was brought under control within 20 minutes after it started. By that time, however, "it had destroyed 600 or more feet of dock."

A sprinkler system had been installed by one of the

contractors, but on the day of the fire it was operative only as far upstream as the vicinity of cargo lift number 3. The dock was 1200 feet long. The fire damage was sustained entirely by the upstream half of the dock and included destruction of cargo lifts numbers 4, 5, and 6. Downstream the fire stopped 30 or 40 feet short of cargo lift number 3 and, although fire trucks and fire boats were soon upon the scene, the evidence warrants a finding that it was the water from the sprinkler system that checked the fire in its downstream progress.

There was a road along the river bank between the dock and the warehouse. At its south end ditches had been dug to carry branch lines from the fire main into the warehouse to serve the warehouse sprinkler systems. Owing to this condition fire trucks which came in at the south end of the warehouse area were unable to reach the fire hydrants there; the firemen, however, were able to attach their hoses to the hydrants.

William Robert Bensel, a piledriver foreman employed by Lord, testified:

"Q I understand immediately after this fire that you were directing your activities to clearing the dock, were you not?
"A That's true.

"Q So to get the vehicles off there so fire trucks could come up?
"A That's true.

"Q Did the fire trucks ever go up on the dock?
"A No, they did not."

In addition to the foregoing alleged failures of the plaintiff to exercise reasonable care in protecting its property against the danger of fire, defendants call attention in their brief to evidence that plaintiff did

not have a fire plan, did not prohibit smoking on the dock, and permitted strangers to come upon the dock even though guards were present.

The plaintiff requested the court to remove all the charges of contributory negligence, separately and in gross, but the court submitted them all to the jury.

The defendants say that the plaintiff undertook to provide fire protection during the course of construction and failed in that undertaking. The principle thus stated by Mr. Justice Cardozo as a judge of the New York Court of Appeals is invoked.

> "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard,* 233 NY 236, 239, 135 NE 275, 23 ALR 1425.

See, also, *Louisville Cooperage Co., Inc. v. Lawrence,* 313 Ky 75, 78, 230 SW2d 103; 1 Shearman and Redfield on Negligence (rev ed) 15, § 8.

As to the automatic sprinkler system, we think the defendants are on solid ground. Putting to one side the agreement of the plaintiff in its contract with MHS to furnish a sprinkler system, the evidence is that it did in fact undertake to do so.

A construction schedule adopted by the plaintiff, copies of which were furnished MHS and Colby, shows the scheduled dates of commencement and completion of the various component parts of the project. Installation of the cargo lifts was to have commenced on June 1, 1958, and to have been completed by the end of August; construction of the sprinkler system was to have commenced on April first and to have been completed by the end of October. The cargo lift

job obviously had fallen behind schedule as the fire occurred on September eleventh. The sprinkler system (both overhead and under the deck of the dock) was then in place, but, as stated, was not operative in the vicinity of cargo lift number 4.

■ Joseph L. Guthrie, Project Engineer for Crown Zellerbach, was the plaintiff's representative on the job with the duty to see that the work was done in accordance with the specifications. He testified with reference to the sprinkler system that the endeavor was to schedule the contractors' work in such a way that "the fire protection would be provided as soon as possible; the earliest phase possible in the work." We think a jury could find from this evidence that the failure to have the sprinkling system operative at cargo lift number 4 when the work there, including welding, was still unfinished, or to warn Lord or its employees of the situation, was a want of reasonable care in the circumstances and that, in view of the effectiveness of the sprinkler in putting out or controlling the fire where it was operative, this omission contributed to the spread of the fire. The plaintiff took this view of the matter in its initial complaint. Reimers and Jolivette, contractors who installed the sprinkler system, were made defendants in that pleading. (They were subsequently dropped from the case.) The complaint charged that, despite their undertaking, Reimers and Jolivette "failed to use proper care and precaution therein, in that said system failed to operate at the time and place of said fire" and that they "failed to provide water by way of sprinkling system to that portion of said dock in which said fire occurred." Since there is evidence that the plaintiff had undertaken this duty, these allegations constitute

an admission of contributory negligence for consideration by the jury.

The remaining charges of contributory negligence are not supported by the evidence. Plaintiff, it may be conceded, was under a duty to use reasonable care for the protection of its own property from the danger of fire: *Louisville Cooperage Co., Inc. v. Lawrence,* supra. Since there was no over-all prime contractor and plaintiff was, so to speak, its own general contractor, the rule applicable to it was as stated in 2 Shearman and Redfield on Negligence (rev ed) 690, § 280:

> "When * * * [an owner] makes separate and distinct contracts with various persons for performance of various parts of the work involved, but retains to himself the co-ordination of those various parts and supervision of the whole work, then he exercises the functions of a general contractor and is chargeable as such."

In such circumstances the owner has a duty to furnish a safe place to work to employees of a subcontractor: *Caspersen v. LaSala Bros.,* 253 NY 491, 494, 171 NE 754; *Lotocka v. Elevator Supplies Co.,* 246 NY 295, 158 NE 874; *Dudar v. Milef Realty Corp.,* 258 NY 415, 180 NE 102. But, as pointed out in *Wohlfron v. Brooklyn Edison Co.,* 238 App Div 463, 265 NYS 18, 21:

> "This obligation is clearly distinguishable from that arising through negligent acts of a subcontractor occurring as a detail of the work. Moore v. Charles T. Wills, Inc., 250 N. Y. 426, 165 N. E. 835.
>
> "The primary duty in a case like this is that of the general contractor or owner who maintains his own force of inspectors to oversee the work and on whom rests the burden of seeing that the place and ways are safe."

■ The general contractor or owner, acting as such, however, "may not remain passive when dangerous prosecution of the work by a subcontractor has been brought to his attention:" Shearman and Redfield on Negligence, supra, 684-685, § 276. There is no evidence that "dangerous prosecution of the work" ever came to the attention of the plaintiff, though Guthrie did, on one occasion, observing that a fire extinguisher was in a somewhat inaccessible location, ask that it be moved.

■ The duty to observe the particular precautions which the evidence indicates are required when electric arc welding is in progress was upon Lord, the subcontractor doing that work, and not upon the plaintiff. If a live hose should have been lying on the dock close by and a chemical fire extinguisher near at hand it was for Lord's employees to see to it that these things were done.

> "The fact that the employer retains a general supervision over the place where the work is done and the right to inspect the work to see if it conforms with the contract, does not make him responsible for the contractor's negligence." Moll, Independent Contractors and Employers Liability, 43, § 20.

The language of Judge Kilkenny in *Hershey Chocolate Corp. v. The S. S. Robert Luckenbach,* 184 F Supp 134 (Or. 1960), quoted in the affirming opinion of the Court of Appeals, *Albina Engine and Machine Works v. Hershey Chocolate Corp.,* 295 F2d 619, 623 (9th Cir. 1961), is not without application:

> "* * * The welding at the forward ladder could have been safely done, if proper and usual precautions had been taken. There was ample space —between 2 and 4 feet between the ladder and the

cargo, in which to erect a fireproof, insulating screen, or curtain; notice to the ship's officers could have been given by the welders when they came aboard that welding was about to commence, and to have water ready; a hose either from the ship (if notice had been given) or from the dock could have been led into the hold with water pressure in it; one or more fire extinguishers could have been at hand. * * * If any of these precautions had been taken, there would have been no fire. Instead, none was taken. The only thing relied on was a can of longshoremen's drinking water left in the hold, which, of course, was utterly inadequate."

The plaintiff equipped the dock with a number of adequate "standard" fire hoses; that the nozzle of the hose nearest to the site of the fire did not reach that far, although the stream of water from the hose did, is not, in our opinion, evidence of want of reasonable care in the circumstances.

As to the lack of a "fire plan," the brief of the defendants does not inform us, nor does the evidence disclose, what sort of a fire plan the owner of a dock under construction must institute in order to meet the requirements of reasonable care. Mr. Guthrie testified on cross-examination that the specifications required each contractor to provide his own fire protection and there was no one individual to tell each person what they were to do about fire protection. Nevertheless, he did impress upon Lord's employees the nature of the precautions to be taken when welding. Welders are supposed to know what precautions they should take and plaintiff was not negligent because there was no one person to tell them. We think it clear that plaintiff had the right to act on the assumption that a subcontractor would take these precautions, at least

until it had notice to the contrary. If the contention is that a fire plan, such as the cross-examination suggests, would have prevented the spread of the fire, it is enough to say that the evidence wholly fails to support such a theory. As previously stated, the fire "spread incredibly fast," but was brought under control within 20 minutes. It is purely a matter of conjecture that a fire plan, either that suggested or some other, would have averted the disastrous consequences of the breaking out of the fire.

This is true also of the contentions that the fire fighting apparatus could not reach some of the fire hydrants or be driven onto the dock. With respect to the former matter, it is to be observed that, as Mr. Justice Cardozo said in *Caspersen v. LaSala Bros.,* supra, 253 NY at 495: "* * * dangers must often be tolerated in a building in process of erection, though needless and so intolerable if permitted in the finished structure." The fire engines could not get to the fire hydrants at the south end of the property because ditches had to be dug there as a part of the work of providing—ironically enough—fire protection for the warehouse then in the course of construction. There is no evidence that fire trucks would have gone upon the dock even though the way had been clear. Had there been any serious handicaps to the efforts of the firemen for either of these reasons, the firemen would have been the expert witnesses on this subject, but none were called.

Finally, the failure of plaintiff to prohibit smoking on the dock and to keep strangers off the dock is not shown to have had any causal connection whatever with either the start or spread of the fire.

Evidence was received of additional precautions

put into effect by Guthrie after the fire to prevent its repetition. It is not claimed, and it could not be, that such evidence was relevant to the issue of contributory negligence other than that it tended to show plaintiff's right of control. Plaintiff had that right to the extent hereinabove indicated, but it did not fail to exercise it in any way that contributed causally to the start and spread of the fire, with the sole possible exception of the failure of the automatic sprinkler system, which presented a jury question. In our opinion it was error to submit the other charges of contributory negligence. We have thought it necessary to discuss specifically only those charges argued in defendants' brief and upon which they apparently rely, but we have considered them all.

## RELEVANCE OF CONTRACT PROVISIONS TO STANDARD OF CARE

Plaintiff requested an instruction reading as follows:

"In determining the standard and duties of care owing by the Defendants to the Plaintiff to safeguard and protect Plaintiff's property from hazard of fire, the contracts between Plaintiff and MHS, between MHS and Colby and between Colby and Lord may all be considered by you as affording some evidence of their responsibility and duties in this connection. While these contracts are not controlling in determining this duty of care, they do constitute evidence which you may consider.

"Provisions in any of them concerning responsibility for loss, methods of operations and precautions to be taken are thus matters entitled to receive your consideration in determining whether the Defendants or any thereof have been guilty of negligence toward the Plaintiff in the particulars charged in the Amended Complaint."

The court refused to give the instruction and the ruling is assigned as error.[7]

The question whether in a tort action the agreement of one of the parties to a contract to take specific precautions for the protection of person or property is relevant, was considered by this court in *Larson v. Heintz Const. Co. et al,* 219 Or 25, 345 P2d 835. That case arose out of a personal injury sustained by a passenger in an automobile who was injured when the car in which she was riding collided with a truck operated by the defendants. The defendants were contractors engaged at the time in highway construction work for the state. The contract obligated them to take certain safety measures, among others, to "provide, keep and maintain such danger lights, signals and flagmen as may be necessary or as may be ordered by the engineer to insure the safety of the public as well as those engaged in connection with the work." We held that "a construction contract which requires the use of warning signals is, by the weight of reason and authority, admissible in evidence against the contractor" and while "the contractor's duty even in the face of such a contract as this remains a duty to use reasonable care" still "reasonableness depends on the circumstances, and here the contract was a circumstance. It is evidence of what the contractor conceived the measure of his duty to be." 219 Or at 37, 52-53. It was further held, however, that the clause in question was not intended as protection against the particular danger encountered by the plaintiff and therefore the trial court did not err in striking from the complaint a paragraph which pleaded the contract. While it

---

[7] The court in the charge removed the contracts in their entirety from the consideration of the jury. Plaintiff duly excepted.

might well be argued that in view of the final disposition of the question what was said about it in the opinion was dictum, still the conclusion announced was arrived at only after deliberation and thorough consideration of the authorities. We adhere to the views expressed in *Larson v. Heintz*. That case was cited with approval and with extensive quotation from the opinion in *Foster v. Herbison Construction Co.,* 263 Minn 63, 69, 115 NW2d 915 (1962), where the court said:

> "* * * The ultimate question still is: What would an ordinarily prudent person have done under the same or similar circumstances? But here we might well say that an ordinarily prudent person, having agreed to perform certain acts for the protection of the public, would have recognized the necessity of complying therewith and that, when injury results from a condition which develops due to the failure to perform according to the contract, it could be found that the failure to perform constitutes a lack of due care. We think that, whatever the reasoning may be, the better rule, and that now followed by the weight of authority, is that such contract provisions should be admitted for the jury's consideration, together with all other evidence, in determining the question of defendant's negligence."

We are not dealing here with an agreement to perform acts for the protection of the public, but it would seem that there is stronger reason for applying this rule to a contractor who expressly agrees, as in the present case, to take certain precautions for the protection of the owner's property from the danger of fire. Additional support for such a rule is found in *Louisville Cooperage Co., Inc. v. Lawrence,* supra, and *Turner v. Robbins et al,* 276 Pa 319, 120 A 274.

*Welter, Adm'x v. M & M Woodworking Co.,* 216
Or 266, 338 P2d 651, cited by the defendants, is not
in point. In that case the plaintiff, an invitee on the
defendant's property, operating heavy equipment over
a logging road constructed by the defendant was killed
as a result of the road giving way. Evidence showed
that the road was defectively constructed. The defend-
ant sought to escape liability by showing that the road
was constructed in exact compliance with the specifi-
cations in a contract between the defendant and the
state of Oregon. In other words, defendant claimed
that its contract with a third party established the
standard of care. We rejected this contention.

Plaintiff cites *Presser v. Seisel Construction Co.,*
19 Wis 2d 54, 59, 119 NW2d 405, and *Patterson v.
Sinclair Refining Co.,* 20 Wis 2d 576, 585, 123 NW2d
479, which hold that the contract may impose an abso-
lute standard of care. We are unwilling to go so far.
The objections to that view are well stated in *Randall
v. Moen Co.,* 206 Iowa 1319, 1323, 221 NW 944, and
*Hanna v. Central States Elec. Co.,* 210 Iowa 864, 871,
232 NW 421.

Several provisions of the "General Conditions" con-
tained in the MHS Purchase Order to Colby for the
cargo lifts are relied upon by the plaintiff as having
a bearing on the standard of care. Defendants contend
that they were waived by MHS along with other Gen-
eral Conditions heretofore considered on the issue of
waiver of the insurance clause. Colby did, it is true,
after it received the Purchase Order, ask MHS to
waive all the General Conditions, but MHS categori-
cally refused. At the same time, however, it indicated
its willingness to review particular items and Colby
then objected specifically to 14 items, 9 of which MHS

agreed to waive. Of the 14 items to which Colby specifically objected only one had any relevance to Colby's duty of care and none of the General Conditions upon that subject was waived by MHS.

■ Plaintiff was entitled to an instruction along the lines of that requested, though the reference to provisions concerning "responsibility for loss" might better be omitted, as they are foreign to the purpose of the instruction. In the view we take of this question the court erred in withdrawing the contracts from the consideration of the jury, at least insofar as their provisions may properly be considered by the jury as bearing on the standard of care.

## RES IPSA LOQUITUR

■ Error is assigned to the court's refusal to give an instruction on res ipsa loquitur. Defendants in their brief do not contest the applicability of the doctrine to a case of this kind; they merely argue that the evidence in support of the specific charges of negligence is so abundant that failure to give the instruction was not prejudicial and that the plaintiff had a measure of control over the welding operation. We think that when the evidence in a case warrants an instruction on res ipsa loquitur it should be given if requested. We have stated above our views as to the extent of plaintiff's control; it was not such, in our opinion, as to take the case out of the rule approved by this court, which is that:

"* * * where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the de-

fendants, that the accident arose from want of care." *Mayor v. Dowsett,* 240 Or 196, 400 P2d 234, 242, and cases there cited.

It is not necessary to decide whether, generally speaking, fires, as the Minnesota Court said in another connection, "resulting in the injury and destruction of property spring ordinarily from negligence in some form." *Commercial Union Assur. Co., Ltd. v. Foley Brothers,* 141 Minn 258, 260, 169 NW 793. A contrary view was expressed in *Kansas City Stock Yards Co. v. A. Reich & Sons,* supra, 250 SW2d at 699, and in *Menth v. Breeze Corporation, Inc.,* 4 NJ 428, 435, 436, 73 A2d 183, 18 ALR2d 1071. In the latter case the court said that "*res ipsa loquitur* is infrequently applied to cases involving fires." The court went on to explain: "The cause of a fire is generally unknown, fires commonly occur where due care has been exercised as well as where due care was wanting." The court conceded, however, that under special circumstances "a presumption of negligence" (we would say an inference) may lead to a reasonable conclusion that due care was wanting, if it be shown that the cause of the fire was under the exclusive control of the defendant, his servants or agents.

There is cogent evidence here that the fire was caused by electric arc welding done by employees of the defendant Lord, a hazardous operation calling for special precautions, *Hershey Chocolate Corp. v. The S. S. Robert Luckenbach,* supra, 184 F Supp at 137; and we think that fires do not ordinarily occur in the course of such an operation if those who have the management exercise care commensurate with the danger involved: *Northwestern Mut. Fire Assoc. v. Allain,* 226 La 788, 77 S2d 395, 49 ALR2d 362; *Shafer v.*

*Lacock, Hawthorn & Co.,* 168 Pa 497, 32 A 44, 29 LRA 254; *Gateway Chemical Company v. Groves* (Mo) 338 SW2d 83, 86;[®] *Automobile Ins. Co. of Hartford v. J. C. Nichols Co.* (Mo) 309 SW2d 698; Shain, Res Ipsa Loquitur, 471.

■ On another trial an instruction on res ipsa loquitur, if requested, should be given.

## REFRESHING WITNESS' RECOLLECTION AND IMPEACHMENT

Plaintiff's witness, Arlen W. Snyder, testified on cross-examination that he could not remember whether the fire was down near the water when he first observed it. He was then asked by counsel for the defendant Lord, for the stated purpose of refreshing his memory, whether in a statement he had given shortly after the fire in the presence of a court reporter he had not said in answer to the question whether there was "anything else now that you could tell us about the fire that we haven't discussed": "I don't know what it would be. I'm convinced of two things, though: That the fire started down quite low near the water, and if the sprinkling system had been on, it would have stopped it right then." Objection by counsel for plaintiff was overruled and the record continued:

"Q (By Mr. Morrison) Do you remember telling him that?
"A Yes.

[®] This case was decided on the pleadings and remanded for trial. After trial it came again to the Supreme Court of Missouri, which held under the evidence that res ipsa loquitur was not applicable. See 370 SW2d 302. As we read the opinion, it did not overrule its former decision.

"Q And that was the truth?
"A As I believed it."

Plaintiff's witness Ellis C. Smith testified that he was working in "cargo hole Number 5" when he first heard of the fire and that at that time a chemical fire extinguisher was between 15 and 30 feet upstream from where he was working.

Again, for the stated purpose of refreshing the witness' memory, the witness was asked on cross-examination concerning a statement given by him a few days after the fire in the presence of the same court reporter and whether he had not said on that occasion that the "chemical cart was thirty or forty feet from the fire." (The quoted words are taken from a longer sentence read by counsel to the witness.)

An objection of plaintiff was overruled and the witness answered, in substance, that he did not remember making such a statement and reaffirmed his previous testimony that the fire extinguisher was 30 or 40 feet upstream from cargo lift number 5.

Counsel for defendant Lord thereupon, over objection of plaintiff, laid the foundation for impeachment of the witness and subsequently the court reporter who took the statement testified from his notes that the witness had given the answer theretofore read to him on cross-examination. Assignments of error based on these rulings will be considered together.

It is apparent from the record that in each instance counsel was reading from a transcript of the stenographic notes of the interview made by the court reporter. The objection of counsel for the plaintiff was on the ground that the transcribed statement was not

shown to the witness or to counsel. Reliance is placed on ORS 45.580, which provides:

> "A witness is allowed to refresh his memory respecting a fact by anything written by himself, or under his direction, at the time when the fact occurred or immediately thereafter or at any other time when the fact was fresh in his memory and he knew that it was correctly stated in the writing; but in either case the writing must be produced, and may be inspected by the adverse party, who may, if he chooses, cross-examine the witness upon it, and read it to the jury. The witness may testify from that writing, though he retains no recollection of the particular facts; but the evidence shall be received with caution."

■ The statute is not applicable because the memorandum, if such it can be called, was neither written by, nor under the direction of, the witness. In fact, it has been strongly suggested by this court that ORS 45.580 is applicable only where a memorandum is used as a record of past recollection and not for the purpose of reviving present recollection: *Manchester Assur. Co. v. Ore. R. R. Co.,* 46 Or 162, 166, 79 P 60, 114 Am St Rep 863, 69 LRA 475. For discussion of this distinction see, also, *State v. Magers,* 36 Or 38, 47-48, 58 P 892; 3 Wigmore on Evidence (3d ed) §§ 734, 763; McCormick on Evidence 15; 4 Jones on Evidence, §§ 964, 972.

■■ We do not deal here with past recollection recorded, but with refreshing present recollection, which may be done by calling to the attention of the witness his earlier oral statements: *State v. Dixon,* 212 Or 572, 579-580, 321 P2d 305; *Weygandt v. Bartle,* 88 Or 310, 318, 171 P 587, or by a memorandum not made by the witness: *Banks v. Community Church,* 178 Or 1,

7, 165 P2d 65; Wigmore, supra, § 759. "It has been said that anything which will refresh the memory of a witness may be resorted to—as, for example, a pictorial preservation of facts:" Jones, supra, § 965. It is equally well settled that the effort to refresh the memory of the witness may come from the cross examining party: Wigmore, supra, §§ 762, 764; *U. S. v. McKeever,* 271 F2d 669, 675 (2d Cir. 1959); *People v. Stone,* 155 Cal App 2d 259, 318 P2d 25, 32-33; *Marti v. Standard Fire Ins. Co.,* 127 NJL 591, 23 A2d 576, 578; *Rex v. Ford,* 5 Cox, CC 184; Annotations, 125 ALR 19, 27; 82 ALR2d 473, 492.

The question remains, however, whether, entirely apart from the statute, counsel for the plaintiff was entitled to see the transcript from which cross examining counsel read in putting the question designed to refresh the witness' memory. It is true that the transcript was not a written statement within the purview of ORS 45.580 nor could it have been used as evidence: *Hall v. Brown,* 102 Or 389, 392-393, 202 P 719; *State v. Goodager,* 56 Or 198, 203, 106 P 638, 108 P 185; *State v. Brake,* 99 Or 310, 332, 195 P 583; *Marti v. Standard Fire Ins. Co.,* supra; *Henry v. Lee,* 2 Chit 124.

However, whether opposing counsel was entitled to inspect the transcript does not depend on its admissibility in evidence, but on considerations of common fairness in the trial of a lawsuit. The matter was well put by Mr. Justice Traynor in *People v. Carter,* 48 Cal 2d 737, 312 P2d 665, where the prosecutor used the transcript of a statement given to the sheriff by a witness for the defendant for the purpose of laying the foundation for impeachment and the court held

that counsel for the defendant was entitled to inspect the transcript. The court said:

"* * * The prosecutor may read to the jury extracts from the transcript selected with an eye to putting the witness in the worst possible light by emphasizing the gap between his prior statement and his present testimony. It is clearly unfair to deny the defendant an opportunity to show that the extracts have been taken out of context, and that when read with other parts of the statement the alleged inconsistency disappears. To be effective such an opportunity must include the right to see the transcript the prosecution has used; the witness' memory of what he said is not enough. * * *" 48 Cal 2d at 753.

See, also, *People v. Brown,* 153 NYS2d 744, 2 AD2d 202; McCormick, supra, 17; Annotations, 125 ALR 194, 82 ALR2d 557. (In most of the cases cited in the annotations the memorandum was shown to the witness, but this is an irrelevant circumstance when the memorandum is in court.) We take it that on this question there is no ground for distinguishing between the use of a transcript to refresh memory and to impeach.

A somewhat different view was expressed in *United States v. Socony-Vacuum Oil Co.,* 310 US 150, 231, 60 S Ct 811, 84 L Ed 1129, where a grand jury transcript was used by the government to refresh the recollection of certain of its witnesses. The court said that "no iron-clad rule requires that opposing counsel be shown the grand jury transcript where it is not shown the witness and where some appropriate procedure is adopted to prevent its improper use." 310 US at 233. That was said to be a matter resting in the sound discretion of the court. In that case the trial court

"adopted the practice of inspecting the transcript and itself seeking to refresh the witness' recollection by reading from his prior testimony." 310 US at 232.

■ Since there is some question about how far an Oregon judge may with propriety go in taking over the examination of a witness in a jury trial, we think the better rule to be that when a transcript of a statement given by a witness is read by counsel for the purpose of refreshing the witness' recollection, opposing counsel, on request, has the right to inspect the transcript whether or not it is shown to the witness. In addition to the reasons stated in *People v. Carter,* supra, such a rule affords opposing counsel "a good opportunity to test the credibility of the witness's claim that his memory has been revived, and to search out any discrepancies between the writing and the testimony." McCormick, supra, 17. See, also, *Commonwealth v. Burton,* 183 Mass 461, 67 NE 419; *State v. Bacon,* 41 Vt 526, 98 Am Dec 616. Furthermore, the rule operates as a safeguard against incompetent and prejudicial matter coming into the case. This is illustrated by what occurred on the examination of the witness Snyder. The only point as to which his recollection required refreshing was the location of the fire when he first saw it. But the portion of the transcript read to him in the presence of the jury was not limited to that point, it included the statement "if the sprinkling system had been on, it would have stopped it [the fire] right then"—an opinion of the witness incompetent for any purpose.

■ There is another reason, though it is not raised on the record, why the question put to the witness Smith for the purpose of refreshing his recollection was subject to objection, and that is that there was no

showing of any need to refresh this witness' recollection. See cases, Annotation 82 ALR2d 493.

What we have said on the question of the right of opposing counsel to inspect the transcripts applies also to the use of the transcript for the purpose of laying a foundation for the impeachment of the witness Smith.

The rulings of the circuit court were not in accordance with these principles. While we are not prepared to hold that they constituted grounds for reversal, we have considered it appropriate to pass upon them as they present a question of first impression in this court and may arise on another trial.

## DEFENSE OF IMMUNITY FROM NEGLIGENCE OF INDEPENDENT CONTRACTOR

█ MHS moved for a directed verdict and urges that its motion should have been allowed. The ground of the motion was that welding is not inherently dangerous and that therefore MHS is not liable for the negligence of Lord, an independent contractor. We need not follow counsel in their attempt to demonstrate that welding is not inherently dangerous, for the case is governed by another principle. Regardless of the question of inherent danger, if Lord is liable, MHS is vicariously liable, because it had entered into a contract to supply six cargo lifts for the plaintiff and it could not avoid its responsibility for injury resulting from the negligent performance of its obligations by engaging a subcontractor to supply the lifts which in turn engaged another subcontractor to install them. The rule is succinctly stated in *Pacific F. Ins. Co. v. Kenny Boiler & Mfg. Co.*, 201 Minn 500, 503, 277 NW 226:

"\* \* \* Where one person owes another a

contractual duty to act, the law imposes upon the person owing that duty the further duty of acting with due care in the performance of his contract so as not to injure the contractee's person or property. This duty is nondelegable. See note, Restatement, Torts, p. 1101. That is, the performance of the contract may be delegated to another, but this delegation does not relieve the contractor of the duty to act, or of his duty to act with due care."

See, also, *Sciolaro v. Asch,* 198 NY 77, 81-82, 91 NE 263, 264; *Schutte v. United Electric Co.,* 68 NJL 435, 437, 53 A 204, 205; *Continental Ins. Co. v. I. Bahcall, Inc.* (ED Wis) 39 F Supp 315, 318; 27 Am Jur 526, Independent Contractors § 48; Annotation, 29 ALR 736.

The contention is without merit.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.