Argued May 24, affirmed June 17, reconsideration denied July 17, petition for review denied July 30, 1974

STATE OF OREGON, *Respondent, v.* JAMES ROBERT LISTON (No. C-72-07-2273 Cr), *Appellant.*

523 P2d 609

*George A. Haslett, Jr.,* Portland, argued the cause and filed the brief for appellant.

*Jim G. Russell,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry and Fort, Judges.

FORT, J.

Defendant was convicted by a jury of the crime of first degree burglary. ORS 164.225. He appeals, asserting as sole assignment of error a ruling allowing a defense witness to be impeached upon rebuttal by a witness who was permitted to refresh his memory from a transcript made from a tape recording.

During the course of the trial the defendant called one Cromwell as a witness. Mr. Cromwell and the defendant had been arrested together, inside the building where and at the time the burglary charged was committed. Cromwell testified[1] that he and "another fellow" had committed the crime charged. He denied that this defendant had committed the crime with him or been in any way involved in it. On cross-

---

[1] Cromwell testified:

"Q [Direct examination by counsel for defendant] All right. Now, you recall the 21st day of July of 1972 when you were arrested along with Mr. Liston inside the Elle's Thriftway Market on 68th and Foster?

"A Yes.

"Q I want you to tell the Jury just in your own words exactly what took place on that early morning hour of July 21, 1972.

"A Well, another fellow and I went over to the Thriftway store and drilled a hole in the roof with a brace and bit and keyhole saw and went down—well, we made a first hole. It wasn't the way to go through, so I made a second hole, went down into the store, and I looked around, and so the other fellow went back to the roof to get the tools that we used to get into the Thriftway store in the first place, and I proceeded to open the back door.

examination he was asked if he recalled being interviewed in the Washington County Courthouse by a police detective, Jerry Sargeant, concerning the burglary charged, but he was unable to remember many of the details of the conversation. He testified on redirect examination that the conversation was tape recorded and that it took from 15 minutes to a half hour.

On rebuttal, the state called Detective Sargeant. He testified that he had conducted that interview with Cromwell, that it had been tape recorded, and that in the usual course of police department business the interview had been promptly transcribed. Viewing his testimony[2] as a whole, we conclude, though inartfully expressed, it supports the conclusion that shortly fol-

---

"Q   How did you open the back door?

"A   Well, I broke a padlock off of an iron bar, just took the bar out.

"Q   What was the reason for doing that?

"A   So to make a quick exit out of the building if necessary.

"Q   All right, go ahead.

"A   Anyhow, I went on back up front and was looking around, and it was just a matter of, oh, a couple of minutes or something like that and Mr. Liston come in and told me to come on, get out of here, let's go.

"He said, 'You shouldn't even be in here.'

"Q   I want the exact words he used when he came in.

"A   Well, he says, 'Why, you stupid son of a bitch. What are you doing in here?' And he was very angry, so he started gathering stuff up to get me out of there, and about that time a couple of policemen come walking down the aisleway, and he says, 'Oops, see what I have got now.'

"He says, 'Don't try to resist or anything.'

"Q   And then what happened?

"A   Well, the police took us into custody. They didn't give any time or explanation or anything and hauled us away down to—out to the cars, separate cars, and then took us down to the police station.

lowing its transcription he had examined the typed interview, and, as transcribed, it then correctly reflected his memory of the interview. Thereafter, the tape was erased and reused in the normal process of police department activity.

"Q   Now, who was this other fellow that you say was with you?
"A   Well, I'd rather not give the name.

"Q   Well, do you know his name?
"A   Yes.

"Q   What is the name?
"A   Well, Ted.

"Q   What is Ted's last name?
"A   I don't think I really should say what his last name is.

"Q   Well, was it Mr. Liston?
"A   No, it was not.

"Q   You are sure of that?
"A   Right."

② Detective Sargeant testified on direct examination:
"Q   [By Deputy District Attorney] As I understand, this conversation was tape recorded, is that correct?
"A   Yes, it was.

"Q   And do you know where that tape is today?
"A   It's been recycled or put back into the—after we use the tapes, if they are not to be used for evidenciary [sic] purposes, we just run them back through and erase them and use them again.

"Q   Did you have the substance of this tape reduced to writing?
"A   Yes, I did.

"Q   Was that done at your direction?
"A   Yes, it was.

"Q   And did you have occasion to review the transcription of this tape?
"A   Yes. I read it about 12:30 today.

"Q   And is it at my request and Detective Wesson's request that you are appearing here in court today?
"A   Yes, it is.

He then testified that he had reviewed the 11-page transcription of the interview two hours before he was called to testify. The transcript was identified by him, marked as an exhibit and shown to both counsel who had it available for purposes of examination and cross-examination of Detective Sargeant. It was not offered as an exhibit by either party. Defendant objected at trial to its use for any purpose including its use by the officer to refresh his recollection prior to trial because the original tape had been destroyed, and because there was no certification of the transcribed statement.

(Deputy District Attorney) "May I approach the witness?

"THE COURT: You may.

"Q * * * [By Deputy District Attorney] Would it aid your memory in recalling the conversation on the 20th of January, 1973, if you were allowed to refresh your memory from the transcription of that tape?

"A Well, I have read it a couple of hours ago and I—the substance is as I recall it.

"Q You have reviewed that?

"A Yes, I have."

On cross-examination he stated:

"Q [By counsel for defendant] Now, Detective Sargeant, when did you transcribe this tape?

"A I didn't transcribe it; the secretary did.

"Q And when was that done?

"A I have no idea. We put them in a box on their desk and they type them up and a copy comes to us.

"Q So then after it's transcribed, do you sit there and listen to the tape and look at the transcription?

"A No, I just read. I read through the article and send the tape back.

"Q And then the tape is destroyed, is that it?

"A Yes, it's erased, yes.

"Q Who transcribed it?

"A Mrs. Kamper, I believe. Let me look. Yeah, her initial is K."

ORS 45.580 provides:

"A witness is allowed to refresh his memory respecting a fact by anything written by himself, or under his direction, at the time when the fact occurred or immediately thereafter or at any other time when the fact was fresh in his memory and he knew that it was correctly stated in the writing; but in either case the writing must be produced, and may be inspected by the adverse party, who may, if he chooses, cross-examine the witness upon it, and read it to the jury. The witness may testify from that writing, though he retains no recollection of the particular facts; but the evidence shall be received with caution."

In *State v. Crater,* 230 Or 513, 517, 370 P2d 700 (1962), the Supreme Court said:

"There is no rule of evidence which precludes a witness from testifying merely because he refreshed his recollection from a written document of some kind prior to taking the stand. If it is shown that a witness's testimony consists of matter which he had forgotten and that the recollection of that testimony is made possible only by reference to a writing not prepared by him, the jury is entitled to take into consideration that fact when weighing the witness's testimony and, as preliminary matter, it is within the discretion of the trial court to exclude or strike such testimony if it appears that the witness's mind was not actually refreshed and that he was not, therefore, competent to testify. * * *"

In its footnote, the court said:

"United States v. Riccardi, 174 F2d 883, 889 (3d Cir 1948); 'It is a preliminary question for his [the trial judge's] decision whether the memorandum actually does refresh and from the nature of the memorandum and the witness's testimony he may find that it does not.' McCormick, Evidence § 9, p. 17 (1954). * * *" 230 Or at 517, n 2.

In *Waterway Terminals v. P. S. Lord,* 242 Or 1, 406 P2d 556, 13 ALR 3d 1 (1964), the court discussed at length (pp 55-61) the matter of Refreshing Witness' Recollection And Impeachment, and its relation to ORS 45.580. In the course of the opinion it stated:

"* * * In fact, it has been strongly suggested by this court that ORS 45.580 is applicable only where a memorandum is used as a record of past recollection and not for the purpose of reviving present recollection * * *." 242 Or at 57.

In McCormick, Evidence 18-19, § 9 (2d ed 1972), the author states:

"The line between using the writing as an aid to memory and basing one's testimony upon it as a correct record of past memory is sometimes shadowy. Must it be shown that the witness has no present recollection of the matters embodied in the memorandum before he can use it as an aid to memory? It is sometimes said that this must appear, but it is believed that this requirement is unsound. The witness may believe that he remembers completely but on looking at the memorandum he would be caused to recall additional facts. As the Chinese proverb has it, 'The palest ink is clearer than the best memory.' On the other hand, there is here the ever-present danger that a suggestible witness may think that he remembers a fact because he reads it. It seems eminently a matter for discretion, rather than rule. Similarly, it would seem that a witness may recognize from present memory the correctness of successive facts set out in a memorandum, but that he may be unable, despite this recognition, to detail those facts from memory without continuing to consult the writing. Accordingly, the statement that a witness once refreshed must speak independently of the writing seems too inflexible, and it is believed that the matter is discretionary and that the trial judge

may properly permit the witness to consult the memorandum as he speaks, especially where it is so lengthy and detailed that even a fresh memory would be unable to recite all the items unaided."

We think the foregoing is consistent with the Oregon authorities previously cited and approve it. *See also: Waterway Terminals v. P. S. Lord,* supra, 242 Or at 60, where the court quoted a portion of the foregoing reasoning with approval.

McCormick, Evidence 17-18, § 9 (2d ed 1972) points out that the rule provides two safeguards:

"* * * The first safeguard is the power of control by the trial judge. It is a preliminary question for his decision whether the memorandum actually does refresh, and from the nature of the memorandum and the witness's testimony he may find that it does not. Moreover, in the exercise of his discretion to control the manner of the examination, as in the case of leading questions, he may decline to permit the use of the aid to memory where he regards the danger of undue suggestion as outweighing the probable value.

"The second safeguard is the rule which entitles the adverse party, when the witness seeks to resort to the memorandum, to inspect the memorandum so that he may object to its use if ground appears, and to have the memorandum available for his reference in cross-examining the witness. With the memorandum before him, the cross-examiner has a good opportunity to test the credibility of the witness's claim that his memory has been revived, and to search out any discrepancies between the writing and the testimony. This right to demand inspection has usually been limited to writings used by the witness on the stand, but the reasons seem equally applicable to writings used by the witness to refresh his memory before he testifies. * * *"

Here the defendant had the statement available to him both prior to and during the challenged testimony. He also had it and used it during his cross-examination. The trial judge, after careful inquiry, correctly exercised his discretion in determining the nature and extent of its use. As the trial judge stated, the weight to be accorded to it was for the jury.

Applying the foregoing authorities here, it is clear that the trial court did not abuse its discretion in permitting Detective Sargeant to testify concerning the statements made to him by Cromwell nor in the use of the written transcription of the statement both prior to testifying and at the trial. Since it was not offered or received as evidence, we do not consider the admissibility of the transcribed statement itself.

Affirmed.